262 F.2d 631
 UNITED STATES of America, Appellee,
v.
FABRIC GARMENT CO., Inc., Joseph Abrams, and Harold Hyman,
Defendants-Appellants.
UNITED STATES of America, Appellee,
v.
FABRIC GARMENT CO., Inc., Mayflower Manufacturing Corp.,
Joseph Abrams, Harold Hyman, and Murray Berman,
Defendants-Appellants, and Alert Trading
Corp., and David Q. Hartman, Defendants.
 Nos. 288, 289, Dockets 24732, 24733.
 United States Court of Appeals Second Circuit.
 Argued June 12, 1958.
Decided Dec. 30, 1958.
 
 Simon H. Rifkind, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Edward N. Costikyan, and Frederick S. Wyle, New York City on the brief), for Fabric Garment Co., Inc. and Joseph Abrams.
 Milton C. Weisman and Cecelia H. Goetz, both of Weisman, Celler, Allan, Spett & Sheinberg, New York City (Weisman, Celler, Allan, Spett & Sheinberg, and Ralph J. Schwarz, Jr., New York City, on the brief), for Mayflower Manufacturing Corp., Murray Berman and Harold Hyman.
 Alan W. Richenaker and Robert B. Fiske, Jr., Asst. U.S. Attys. for Southern District of New York, New York City (Paul W. Williams, U.S. Atty., and Charles H. Miller, Asst. U.S. Atty., S.D.N.Y., New York City, on the brief), for the United States.
 Before HINCKS and WATERMAN, Circuit Judges, and RYAN, District Judge.
 HINCKS, Circuit Judge.
 
 
 1
 This appeal grows out of two indictments which were consolidated for purposes of trial and appeal. One had been returned against Abrams, Hyman and Fabric Garment Co., Inc., plus Mayfiower Manufacturing Corp., Berman, Alert Trading Corp. and Hartman, charging (1) the unlawful sale of approximately 19,000 yards of Government-owned wool serge, in violation of 18 U.S.C. 641, and (2) a conspiracy to defraud the United States and to violate 18 U.S.C. 1001.[1] The other indictment charged violation of 18 U.S.C. 1001, and contained eight counts charging Abrams, Hyman and Fabric Garment Co., Inc., with the making of eight separate false statements about the disposition of wool serge furnished to the Fabric Garment Co. by the New York Quartermaster Procurement Agency under four contracts to make jackets for the United States Army.[2] After a trial to a jury, Alert Trading Corp. and Hartman were acquitted; the other defendants were convicted. From these convictions and from the denial of a motion for a new trial, the convicted defendants appeal.
 
 
 2
 Both indictments grew out of four successive contracts which the New York Quartermaster Procurement Agency, in 1951, entered into with the defendant Fabric Garment Company (Fabric), under which Fabric was to manufacture, in the aggregate, 450,000 Eisenhower jackets for the Army out of 18 ounce olive drab wool serge to be furnished by the Procurement Agency. The contracts provided that unless otherwise directed by the contracting officer, on the completion of each contract Fabric should return all surplus property and scrap 'not returned in form of acceptable articles.' It was further required by each contract that on QM Form 183 Fabric should certify that 'all property furnished by the government * * * has been returned * * * in the form of finished articles, full pieces, short pieces, remnants, clippings containing wool * * *' subject to 'the penalty imposed by Section 1001 of Title 18 U.S.C.A. of the Criminal Code for so certifying falsely.' And on Form 201 Fabric was to certify the amount of surplus Government furnished property 'on hand' at the completion of the contract.
 
 
 3
 The Agency supplied over 709,000 yards to Fabric for the manufacture of jackets, delivering this material to Fabric's cutting room first at 473 Liberty Street, and later to Knickerbocker Ave., both of Brooklyn, where it was stored pending processing. Fabric returned 454,814 finished jackets plus 89,238 pounds of wool scrap.[3] The specified Government forms, two for each contract, were certified by Fabric purportedly over the signatures of Abrams and Hyman or both at the completion of each contract. The foregoing facts were not contradicted.
 
 
 4
 The appellants now contend that the evidence was insufficient to support the verdicts. At the trial the prosecutor, to prove the charge of an illegal sale of wool, offered evidence which if accepted established the following facts. Abrams, officially the secretary of Fabric, was its 'boss.' Berman was the proprietor and operator of Mayflower Manufacturing Corp. (Mayflower) and a close associte and assistant of Abrams in the operation of Fabric. In January 1951, Berman rented premises for Mayflower for the storage of cloth, at 450 Liberty St., Brooklyn, a block away from Fabric's plant. In July 1951, after Fabric had received the wool serge under the first two Government contracts, Abrams told a trucker, whom he had frequently employed to carry the Government serge to and from the place it was cut, to pick up 30 pieces of goods at Mayflower and truck it to Alert. The trucker received these pieces from Berman at the Mayflower premises and in the transfer the brown paper wrapping on certain pieces was broken disclosing serge which the trucker testified as the 'same' and 'looked the same' as the Government serge which at Fabric's behest he frequently transferred for cutting. Other such deliveries to Alert were made in July and August, 1951, some of which were confirmed by trucking tickets. In all, some 19,000 yards were sold to Alert as was proved by Mayflower's invoices and Alert's checks.
 
 
 5
 There was uncontradicted evidence that in July and August, 1951, the checks in payment of the sales to Alert were deposited in the Mayflower bank account; that shortly thereafter Abrams caused $15,000 to be withdrawn for his personal use by devious devices whereby a bank check on Mayflower was exchanged for the check of Abrams' personal attorney in Washington, D.C., which in turn was used to pay for Abrams' purchases of oil well leases in Illinois. Moreover, Abrams made an unsuccessful attempt to obtain from the trucker possession of the trucking tickets which evidenced the transfer of the piece goods from Mayflower to Alert. And after the Government investigation began in December, 1951, Berman fled, remained in hiding under an assumed name for several months and discontinued the payment of rent for the Mayflower premises.
 
 
 6
 There was other evidence to identify the serge sold to Alert as that furnished by the Government to Fabric. The Government investigators found in the Mayflower premises, whence the delivery to Alert had been made, a piece goods ticket which had been attached to a piece of serge furnished to Fabric under its first contract for the Eisenhower jackets. Moreover, there was evidence of a 'paper test' made at the instance of the prosecution which was offered to show that the linear yardage of serge, in pieces 56' wide, which went into the finished jackets plus that of the scrap returned was 46,451 yards less than the yardage furnished for all four contracts and 30,000 less than the 425,876 yards which had been furnished on the first two contracts before the sale from Mayflower to Alert had been made. Thus according to this test, Fabric should have had on hand more surplus serge than that delivered to Alert. To be sure, the validity of the test and the accuracy of its indications were challenged by the defense and the admission of its results is now assigned as error. We now proceed, therefore, to give the test detailed consideration.
 
 
 7
 The primary purpose of the paper test was to ascertain the square yardage of the wool serge used in the completed jackets. The scheme of the test was suggested by the method of manufacture which was as follows. From copies of the master linen-paper patterns of all sizes of the jackets provided by the Quartermaster Corps, Fabric caused working patterns to be cut on heavy paper cardboard from which thin paper 'markers' were traced. These were superimposed upon 'lays' of the wool serge which comprised lengths of 80-layer thickness. The serge was then cut by an electric knife along the pattern of the marker. There were twenty-five separate irregularly shaped pieces of serge in each completed jacket and the contracts called for jackets of thirty different sizes.
 
 
 8
 The prosecution's paper test followed this basic scheme. A set of the twenty-five patterns for each size jacket was reproduced in heavy paper from the master pattern. This set of patterns, after conditioning, was weighed and the weight compared with that of a square yard of the same paper similarly conditioned, thereby establishing a ratio of area to weight from which was computed the square yardage of the aggregate pieces of serge going into one jacket of each size. This figure, expressed in square yards, by simple mathematical computation was translated into linear yardage of 18 ounce wool in pieces 56' wide.
 
 
 9
 There was detailed testimony as to the manner in which the test had been carried out. Mr. Strykower, the military apparel designer of the Philadelphia Quartermaster Depot, testified that the master patterns for Eisenhower jackets, copies of which were sent to Fabric for the performance of the contracts, were in his custody; that pursuant to instructions, he cut out in designer's pattern paper exact duplictes of the master patterns in use at the time of the Fabric contracts; and that he turned these paper parts over to Mr. Bordonaro, head of the physical testing section of the paper and paper products at the Philadelphia Depot. Mr. Bordonaro testified to the conditioning and weighing of the paper parts. And finally, Mr. Good testified to the conversion of weight into yards and to the computation of the yards of wool, which by analogy the prosecution argued had gone into the completed jackets.
 
 
 10
 Although forewarned of the method of this test, the appellants offered no witness who disputed its basic validity. They did, however, question its accuracy urging that apart from any questions as to its probative value on the issue as to the amount of serge which was returned to the Government in the form of finished jackets, the test was not admissible to prove the amount of serge which Fabric should have had on hand at the completion of the contract. This is so, they say, because there was evidence that in the manufacturing process lengths of selvage were used to tie bundles of cut parts together; that scrap serge fell from the cutting tables to the floor and was swept up and disposed of; that other scrap was used for kneepads, plugging leaky steam pipes and cleaning machines; that pieces of the serge were excised as defective; and that in fitting together the several parts of a jacket for stitching there was some trimming which resulted in clippings which were swept up and disposed of. The prosecution, however, disputed and minimized such evidence by pointing out that no written dispensation was shown for the plain provisions of the contracts for the return of all scrap; that the contractor was not charged with the selvage; that a substantial allowance for defective pieces had been included in the amount of fabric charged against the contractor and, moreover, any piece excised as defective could and should have been returned as scrap; and that the scheme of the paper test was such that the trimmings were included in the area of serge included in the finished jackets and in that form had been duly credited to the contractor. These conflicting contentions were fairly submitted to the jury.[4]
 
 
 11
 We hold that the paper test was rightly admitted and submitted to the jury. The ruling lay within the discretion of the judge. United States v. Ball, 163 U.S. 662, 673, 16 S.Ct. 1192, 41 L.Ed. 300. We think his discretion was wisely exercised. The problem was one for the determination of area-- the aggregate area in square yards of the congeries of separate, highly irregularly-shaped serge parts that went into a jacket. The solution reached depended upon a ratio or proportion; and both factors of that proportion were expressed in the weights of designer's detail paper taken from the same roll and similarly conditioned overnight. There was a corresponding similarity in the process of manufacture: the 'lays' were made and the pieces cut from rolls of serge stored in the same room under the same conditions of temperature and humidity. Thus the conditions of the test had a high degree of similarity to the process of manufacture which gave the ratio thus established substantial accuracy as a means to measure the area, in terms of yardage, of the serge going into a jacket. The test provided a method for the determination of area which would be helpful to the jury in determining how much of serge furnished was left in Fabric's hands after the jackets had been delivered. It was admissible under the rule of Lever Bros Co. v. Atlas Assur. Co., 7 Cir., 131 F.2d 770, which also was concerned with determination of a method of measurement. Its validity depended upon measurable quantities which gave it even more reliability than such tests as were involved in Lobel v. American Airlines, 2 Cir., 205 F.2d 927, and other cases such as American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, 119, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575, and Gaillard v. Boynton, 1 Cir., 70 F.2d 552. And we find no error in the receipt in evidence of Government Exhibit 177 which was a compilation of the evidence basic to the prosecution's calculations of the amount of serge furnished which was not returned. United States v. Schenck, 2 Cir., 126 F.2d 702, certiorari denied sub nom. Moskowitz v. United States, 316 U.S. 705, 92 S.Ct. 1309, 86 L.Ed. 1773; United States v. Samuel Dunkel & Co., 2 Cir., 184 F.2d 894, 898, certiorari denied 340 U.S. 930, 71 S.Ct. 491, 95 L.Ed. 671; United States v. O'Connor, 2 Cir., 237 F.2d 466. And see United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546; Kemler v. United States, 1 Cir., 133 F.2d 235, 240; IV Wigmore on Evidence, 3d Ed., 1230.
 
 
 12
 We do not overlook the appellants' interesting and ingenious argument that resort by the Government to the paper test necessarily brought into play the principles of the net worth tax evasion cases. Claim is made that the prosecution failed to comply with the safeguards laid down for such prosecutions in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. The theory is that here, as in a net worth tax evasion case, the prosecution's case depends on an accounting as to which the burden is on the prosecution to prove all credits to which the defendants are entitled as well as the debit items charged against them. And so they contend that the burden was on the Government to prove the amount of wool which permissibly (as they assert) went into scrap but was never returned or accounted for. We see, however, no valid analogy with net worth cases.[5] For in such cases the problem relates to the inferences which may be drawn from changes in a defendant's net worth resulting from dealings with his own property to which, of course, the Government had neither title nor right to possession. Here the problem relates not to appellants' property but to property of the Government, title to which, under an express provision of the contract, remained in the Government throughout the manufacturing process and which appellants were under a contractual duty to return in the form of finished articles or scrap.
 
 
 13
 The appellants make much of the contract provision whereby the duty to return remains in force 'unless otherwise directed by the Contracting Officer.' But we agree with counsel for the Government that the contractual condition just quoted relative to a contrary direction by the Contracting Officer was one by way of condition subsequent. Consequently, if the appellants relied upon the condition, it was for them to come forward with some evidence that the Contracting Officer had indeed 'otherwise directed.' Javierre v. Central Altagracia, 217 U.S. 502, 30 S.Ct. 598, 54 L.Ed. 859; Davies Flying Service v. United States, 6 Cir., 216 F.2d 104. See also McKelvey v. United States, 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301; United States v. Krepper, 3 Cir., 159 F.2d 958, certiorari denied 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275. Of such evidence there was none. It is true that the appellants point hopefully to the testimony of one of Fabric's employees who when called by the Government reported the Government inspector assigned to these contracts as saying that 'any clippings * * * that would fall off the table and hit the floor, you are not allowed to send back to the Government.' But it is scarcely sensible to construe the quoted statement as conclusively establishing an exception authorized by the Contracting Officer to the contractual provision calling for the return of all scrap, especially in view of a contractual provision that 'Directions of the Contracting Officer and communications of the contractor issued pursuant to this clause shall be in writing.' Certainly the jury was not required to accept this testimony as sufficient to establish an authorized disposition of the scrap otherwise than by return to the Government. At most, it created a factual issue which the jury by its verdict resolved against the defendants. We see no occasion here for application of the Holland rules.
 
 
 14
 At trial another line of defense to the charge of an unlawful sale was advanced. The appellants called witnesses who testified in some detail that Abrams in 1946 had bought some 20,000 yards of 18 ounce olive drab wool serge at $2.75 per yard which a friend had stored for him without charge for some four years. Despite the size of this alleged transaction, there was no documentary evidence either of its consummation, of the carrying charges throughout the subsequent years such as insurance, or of inventory reports. Abrams' friend testified that in the middle, or possibly the spring, of 1951 (which was after Fabric had received the Government serge on the first two contracts), he delivered this serge in numerous successive shipments as requested by Abrams, to Mayflower.
 
 
 15
 It seems to us beyond argument that there was ample proof of a sale to Alert in July and August 1951 of some 19,000 yards of serge made nominally in Mayflower's name but actually at the instance of Abrams with the active assistance of Berman. Not so strong, perhaps, was the proof that the subjectmatter of the sale was Governmentowned serge. But on this issue also, which lies at the heart of the controversy, we are satisfied that, except as to Hyman, the totality of the evidence adequately supports the verdict. United States v. Pugliese, 2 Cir., 153 F.2d 497. Certainly it lay within the province of the jury to reject as incredible the defense testimony of a personal investment in wool serge by Abrams which he had carried until its sale to Alert five years later. The jury may well have considered this shallow explanation entirely false and fabricated and as indicative of a consciousness of guilt on the part of Abrams and Berman. United States v. Von Clemm, 2 Cir., 136 F.2d 968, certiorari denied 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459; Di Carlo v. United States, 2 Cir., 6 F.2d 364, certiorari denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168; Hodgskin v. United States, 2 Cir., 279 F. 85, 93. Especially telling was the devious method used by Abrams to siphon $15,000 out of Mayflower's treasury after Alert had paid Mayflower for its purchase of serge. The verdict did not rest on hearsay declarations made by Hartman, of the Alert Trading Co., as appellants suggest. Documentary evidence was received which showed that payments by Alert of charges on Mayflower invoices were covered into the Mayflower bank account from which Abrams' circuitous withdrawals were fully proved by competent evidence.
 
 
 16
 The appellants further claim that because the jury ultimately acquitted Hartman of conspiracy with the appellants, Hartman's acts and declarations, as testified to by Government witnesses Cooper and Agent Mulderig, were inadmissible against the appellants. The law, however, is otherwise. There was evidence in the record relating to Hartman's relationship to the appellants which justified the admission of this testimony. United States v. Dennis, 2 Cir., 183 F.2d 201, 230-231 affirmed 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; United States v. Pugliese, supra; Kamanosuke Yuge v. United States, 9 Cir., 127 F.2d 683, certiorari denied sub nom. Mateus v. United States, 317 U.S. 648, 63 S.Ct. 43, 87 L.Ed. 522. Of course it does not follow that the evidence of Hartman's declarations because it was properly admitted might be used against other defendants absent a finding that Hartman was a co-conspirator or a partner in a common criminal enterprise. But there is nothing to show that the jury gave the evidence improper application. At the time this testimony was received, the jury was properly cautioned as to the effect of the declaration. And there was no request for a repetition of this caution in the charge.
 
 
 17
 As to Hyman, however, a different result is required. It is true that he was titular president of Fabric and a signature purportedly his appears on some of the contracts and the government forms. There was vague testimony that his position in Fabric was that, roughly, of factory superintendent. But there was no direct evidence that he knowingly assisted in the sale of Government wool to Alert or participated in the proceeds and no evidence of his activities from which such participation should be inferred. As to him there was no evidence of consciousness of guilt. For lack of evidence, we hold that his conviction should be set aside and that the charges pending against him under both indictments be dismissed.
 
 
 18
 We will now assess the sufficiency of the evidence to support the eight counts of the companion indictment charging the making of false statements in violation of 18 U.S.C. 1001. The verdicts on these eight counts necessarily import findings that the defendants Fabric, Abrams and Hyman knowingly made, or caused to be made, two false certificates with respect to each of the four contracts. As to Hyman, these findings are unsupported by evidence sufficient to establish his knowledge of their falsity. We therefore shall focus our scrutiny on the evidence against Fabric and Abrams.
 
 
 19
 It is urged in behalf of Abrams that as to the four certificates which the Government alleges bear his signature (those charged in Counts I, II, III and VII of the indictment) there was no evidence which authenticated his signature as genuine. It is true that there was no direct authenticating testimony. However, in addition to these certificates there were in evidence several other documents which were alleged to bear Abrams' signature. Thus the signature page of the original contract, QM 12372, contained a certificate purportedly showing Abrams' signature which compared with his signature on a 'Request for Signatures' which the Procurement Agency had previously sent to and received back from Fabric complete with the requested signatures. Although Abrams' signature on none of these documents had been directly identified by a qualified witness, we think it was permissible under the evidence of the dealings between the Government and Fabric and Abrams to infer the authenticity of these documents and to conclude that the Abrams' purported signatures on the certificates were indeed his. Hupman v. United States, 6 Cir., 219 F.2d 243, 247, certiorari denied 349 U.S. 953, 75 S.Ct. 882, 99 L.Ed. 1278. The jury may well have thought this circumstantial evidence all the more convincing because of the fact that it stood uncontradicted by any evidence to dispute the authenticity of Abrams' signatures on the certificates.
 
 
 20
 However, to hold Abrams on these certificates it was not necessary for the Government to prove even circumstantially that the certificates each actually bore a signature made by his hand. From the many facts in evidence showing Abrams' dominance in the Fabric enterprise and his participation in the sale to Alert, the jury might reasonably have inferred that even if his signature had been placed on some of the certificates by a subordinate and even if on other certificates his signature did not appear at all, he himself had caused the certificates to be made and was criminally responsible as an accessory under 18 U.S.C. 2 for all those certificates which were proved to be false.
 
 
 21
 But Abrams and Fabric further assail the false statement convictions for lack of evidence to show that the certificates were false or known by them to be false. As to the four certificates relating to the first two contracts, This attack is clearly unfounded. The evidence which we held sufficient to sustain the finding of the illegal sale of Government-owned wool by Abrams to Alert is equally sufficient to support findings that to their knowledge all the serge furnished on the first two contracts had not been returned or transferred with authority, as certified, and that to their knowledge the surplus inventory had been falsely certified.
 
 
 22
 The case is not so strong as to the two 'Return of Inventory' (Form 201) certificates relating to the last two contracts: there is no evidence that any particular illegal sales had been made from material furnished under these two contracts. Nevertheless, the evidence based on the paper test showed such great disparity between the material concededly furnished and that which was returned that, if the test were accepted by the jury as it might properly have been, the jury might properly conclude that there was an unreported shortage of such substantial magnitude that Fabric and Abrams must have known that these two certificates also were false.
 
 
 23
 But as to the two 'Return of Property' (Form 183) certificates covering the last two contracts we agree that there was a vital failure of proof. These two certificates recited that the property furnished had been returned 'and/or transferred as authorized' by the Procurement Agency. This alternative disposition was not stated as an exception or a condition subsequent to the provision for return. To prove the certificate false, it was incumbent on the Government to prove that surplus material had neither been returned nor transferred as authorized. And we find no proof of an absence of authorized transfer. Thus although we see no valid reason to disturb the verdicts against Fabric and Abrams on Counts V and VII as well as Counts I to IV, inclusive, the convictions of Fabric and Abrams on Counts VI and VIII must be reversed and the cases remanded for new trial on said counts if the United States so elects.
 
 
 24
 The appellants also question the sufficiency of the evidence to support the conspiracy count (Count III of Indictment 144-188). As noted above, as to Hyman we agree that the evidence was insufficient. But as to the other appellants we hold the evidence was ample. As to them, the evidence of collusion in the sale of Government-owned wool to Alert, to mention one of the numerous items of relevant proof, warranted an inference that they had agreed to cause false statements to be made in violation of 18 U.S.C. 1001. Otherwise, they could not hope to conceal their crime.
 
 
 25
 In addition to the foregoing contentions, numerous other claims of error are pressed upon us by the appellants. They charge that venue both of the false statement counts and of the conspiracy count was improperly laid in the Southern District of New York. It is unnecessary to pass on the merit of this contention. For the venue was not questioned until after the Government had completed its case. The objection therefore was waived. United States v. Miller, 2 Cir., 246 F.2d 486, rehearing on other points denied,248 F.2d 163, certiorari denied 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261; United States v. Spagnuolo, 2 Cir., 168 F.2d 768, certiorari denied 335 U.S. 824; Hagner v. United States, D.C.Cir., 60 App.D.C. 335, 54 F.2d 446, affirmed 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861. But even if the objection to venue had not been waived, we should sustain the venue. The overt acts alleged in the conspiracy count were the filings, in the Southern District of New York, of the false statements with respect to the four Government contracts. The proofs showed that these statements were to be submitted to the 'Contracting Officer' whose office was with the New York Procurement Agency at 111 E. 16th, New York City, in the Southern District of New York, and that the completed forms were found there in the files of that agency. This was enough to sustain the challenged venue in the Southern District. DeRosier v. United States, 5 Cir., 218 F.2d 420, certiorari denied 349 U.S. 921, 75 S.Ct. 660, 99 L.Ed. 1253, and United States v. Miller, supra. Even if the completed forms had been dispatched from Brooklyn, the crimes charged were completed when the statements became a part of the Agency files in Manhattan. Cf. United States v. Miller, supra.
 
 
 26
 After passing a few scattered claims of error which we find without substance and overrule without discussion, we now come to the appellants' vigorous assertion of error in denying their motion for new trial. The motion was based in part on evidence allegedly newly discovered and in part on a cognate contention that the newly discovered evidence had been improperly suppressed by the prosecution.
 
 
 27
 The evidence derived from one Oliveri, an employee of Fabric, who stated that throughout the performance of the contracts he with the help of fellow employees had daily sold an undefined amount of wool scrap to junk dealers, and that he had not revealed this practice to the appellants until after their conviction. However, although the appellants had been forewarned of the trend of the Government's proofs, their motion was supported by no showing that the appellants, by seasonable inquiries of Oliveri and the other employees, could not have learned of this disposition of the wool scrap before trial.
 
 
 28
 The claim of wrongful suppression rested upon the conceded fact that prior to trial Oliveri in an interview with the prosecuting attorney and an FBI agent informed them that in the course of the performance of the contracts he had been selling scrap. But the motion papers also revealed that Oliveri had been interviewed by defense counsel the day before and the day after his interview with the prosecuting attorney. At one of these interviews, according to the affidavits in support of the motion, defense counsel ascertained that Oliveri had a criminal record and on that account decided not to call him as a witness. But, according to the supporting affidavits, the appellants never knew that Oliveri had information helpful to the defense. Why the defense should have rejected Oliveri as a witness because of his prior record before knowing whether he had helpful evidence, is unexplained. However that may be, under all the circumstances appearing of record we think it would be fantastic to sustain a charge of an improper suppression upon the failure of the prosecution either to sponsor a witness whom the defense had rejected as lacking in credibility, or to inform the appellants of information derived from their own employee who was in immediate contact with appellants' counsel. The charge of suppression is reminiscent of a tactic as old as the art of warfare which recognizes that there are times of adversity when a vigorous offense is the best defense available.
 
 
 29
 We affirm the denial of a new trial on Judge Walsh's penetrating (unreported) opinion the vitality of which, in our judgment, is unimpaired by the appellants' assault. The ruling is in accord with authoritative precedent. Nardone v. United States, 308 U.S. 338, 342, 60 S.Ct. 266, 84 L.Ed. 307. See also United States v. Costello, 2 Cir., 255 F.2d 876, certiorari denied 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551, rehearing denied 79 S.Ct. 220. Moreover, 'it does not clearly appear that the findings are not supported by any evidence.' It follows that we may not intervene. United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562.
 
 
 30
 As to the appellant Hyman, the convictions under both indictments are reversed and the case remanded with a direction to dismiss. As to all other appellants the convictions are affirmed except that as to Fabric Garment Company and Abrams the convictions on Counts VI and VIII of Indictment 144-185 are reversed and remanded for new trial.
 
 
 
 [1]
 Indictment C 144-188
 
 
 [2]
 Indictment C 144-185
 
 
 [3]
 The prosecution offered credible evidence that this 89,238 lbs. of scrap was equivalent to 79,322 yards of the 56' serge which had been furnished
 
 
 [4]
 As to this the judge charged:
 'In that respect we get into this paper test. The Government claims that the records show the gross yardage sent to the contractor, to Fabric Garment Co., Inc.; that the paper test shows how many yards went into these garments, and that by the weight of the scrap returned they can compute the equivalent in yardage, and they claim that when that is all done there is a shortage, I think, of about 46,000 yards.
 'The defendants claim that the records as to serge show gross yards, and they have explained the deductions they think should be taken from gross yardage, as to defects and so forth. They say the paper test was an unscientific test. They say you cannot compute yardage from the weight of the scrap returned because of the unscientific manner in which that was done, and they say there has been no paper allowance for waste and sweepings.
 'That is the broad outline of the controversy, and as to these charges, without suggesting that one thing is more important than another, that has been, in point of time consumed, perhaps the principle issue underlying this controversy * * *'.
 
 
 [5]
 Naturally, the information of the prosecution in a net worth case as to the existence and amount of assets includable in a defendant's opening net worth statement lacks both the specificity and the authenticity of the prosecution's information as to the amount of Government wool which was actually entrusted to a contractor for manufacture. Moreover, under the net worth theory the Government's case depends upon an opening net worth statement which generally goes back to a time long before the taxpayer was on notice of any need to keep an accurate tabulation of his assets. In the instant case, however, the contractor was on notice from the time the contract was signed that he would be required to certify, under pain of the penalty imposed by 1001, the amount of serge not returned to the Government at the completion of the contract