UNITED STATES of America, Appellee,

v.

Jacob POLIN, Appellant.

No. 14174.

United States Court of Appeals Third Circuit.

Argued May 6, 1963.

Decided Sept. 23, 1963.

Edward G. D'Alessandro, Newark, N. J. (Anthony A. Calandra, Newark, N. J., on the brief), for appellant.

Jerome D. Schwitzer, Asst. U. S. Atty., Newark, N. J. (David M. Satz, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before McLAUGHLIN and FORMAN, Circuit Judges and COOLAHAN, District Judge.

FORMAN, Circuit Judge.

Jacob Polin, Phil-Jer Freightways, Inc. (Phil-Jer), John Richards and Richards Freight Lines, Inc. (Richards Freight) were joined in an indictment of three counts. The first count, charged them with conspiracy between December 1, 1957 and June 1, 1958, to defraud the United States and to commit offenses against it,[1] by causing material false statements and representations to be made in connection with an application on form BMC–76 to the Interstate Commerce Commission (Commission) to transfer a portion of the certificate of further convenience and necessity of Laurel Transport Corporation (Laurel) in violation of 18 U.S.C.A. § 1001[2] and to accomplish and effectuate the control and management in a common interest of Richards Freight and Phil-Jer without obtaining the approval of the Commission in violation of 49 U.S.C.A. § 5(4).[3]

The second and third counts charged the defendants with violating the substantive offenses interdicted in 18 U.S.C.A. § 1001 and 49 U.S.C.A. § 5(4) on January 30, 1958 and May 9, 1958, respectively.

A plea of nolo contendere was accepted from Richards Freight. Each of the other defendants entered a plea of not guilty. At their jury trial they rested on the Government's case and were convicted

---

1. The conspiracy count is based on 18 U.S. C.A. § 371, as follows:

   "§ 371. Conspiracy to commit offense or defraud United States

   "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. 18 U.S.C.A. § 1001 reads:

   "Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations,

   or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

3. 49 U.S.C.A. § 5(4) reads:

   "§ 5, par. (4). *Control effected by other than prescribed methods.* It shall be unlawful for any person, except as provided in paragraph (2) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly. * * *."

on all three counts.[4] Polin alone prosecutes this appeal.

Motions for a directed verdict of acquittal were made at the end of the Government's case and renewed before the case was presented to the jury. After the jury's verdict a timely motion was made to set it aside. It and the motions for directed verdict were denied.

Out of a great mass of oral and documentary evidence emerge the following circumstances pertinent to the Government's charges:

In May of 1956 Henry Pfeiffer and Alfred J. Marts had agreed to purchase the outstanding shares of stock of Laurel whose principal place of business is at Wildwood Crest, New Jersey. It operated under a certificate of convenience and necessity issued by the Commission which authorized it to transport by motor vehicle in interstate commerce as a common carrier commodities between Philadelphia and points in the following counties in New Jersey: Cape May, Cumberland, Gloucester and Salem. Laurel also had the right to transport household goods between Philadelphia and certain other points in Southern New Jersey but those routes are not involved in this litigation. Messrs. Pfeiffer and Marts had agreed to pay $23,000 for the stock. Each was to make a down payment of $7,500 and the balance was to be represented by their promissory notes. Each gave his check for the down payment but Mr. Marts's developed fatal infirmities. Mr. Pfeiffer was in danger of losing his payment and consulted a friend, Maurice Robbins, who, in turn, introduced him to the defendant, Jacob Polin, a practitioner before the Commission. Messrs. Polin and Robbins came to the rescue. They made good the deficit caused by Mr. Marts's default and the deal was consummated. It appears from

the testimony of **Mr. Pfeiffer** that he was not called upon to pay anything on account of any balance due on the purchase price and the record fails to disclose if and how such balance was financed.

Following the purchase, ten shares of Laurel were issued,—four to Mr. Pfeiffer, three to the defendant Mr. Polin and three to Mr. Robbins.

Mr. Pfeiffer took charge of the trucking end of the business and Mr. Polin handled all matter pertaining to the requirements of the Commission such as the making of logs and documents in connection with interchange of equipment. Mr. Robbins did not participate in the operation of the business. It was under such auspices that Laurel operated in 1957 and part of 1958.

Meanwhile the defendant, John Richards, was operating Richards Freight, a Pennsylvania corporation, from its headquarters in Scranton, doing a motor vehicle transportation business involving some 35 tractors and approximately 90 trailers. However, it was experiencing difficult financial circumstances. In the latter part of 1957 it welcomed an opportunity to engage in an extensive movement of glass containers from Salem, New Jersey to Canajoharie, New York, but it lacked the rights to haul the freight over its own routes continuously from the point of origin to destination. On the northern end it had no authority from Utica to Canajoharie in New York and on the southern end, from Salem to Camden in New Jersey. To supply the deficit it arranged to interline its movement from Utica to Canajoharie in New York with the Kelly Transport Company and from Salem to a point near Camden in New Jersey with the Star Transport Company (Star).[5]

4. Polin was sentenced to pay fines of $4,000 each on the first and second counts and $2,000 on the third count of the indictment. Lesser fines were imposed on the other defendants.

5. Under lease regulations of the Commission an operator who desires to carry

freight beyond his own lines may enter into an arrangement with a connecting carrier to interchange equipment and personnel, a practice known as interlining or interchanging. At the point of interchange an independent agent is appointed to inspect equipment for compliance with safety regulations. The principal car-

From January 1, 1957 to December 1958 Mr. Richards and Richards Freight were represented in Commission matters by Edward F. Bowes and A. David Millner, attorneys of the State of New York and practitioners before the Commission with offices in Newark, New Jersey. The firm was on a monthly retainer and its members consulted frequently with Mr. Richards with respect to the many problems that arose in the daily operation of Richards Freight. Messrs. Bowes and Millner represented Richards Freight in the negotiations for the interline with Star which was represented by Mr. Polin.

After only a brief period Mr. Polin, on behalf of Star, notified Richards Freight and Messrs. Bowes and Millner that it desired to terminate the relationship at the end of December 1957.

In anticipation of the termination of the association with Star Mr. Richards was naturally anxious to obtain a substitute interline carrier for the Camden-Salem leg of the Canajoharie-Salem business. The anxiety in this respect was shared by Messrs. Bowes and Millner. On learning of the decision of Star to discontinue its relationship with Richards Freight Mr. Millner inquired of Mr. Polin as to the availability in the area of an appropriate substitute connecting operator. Mr. Polin informed him that Laurel was such an operator and might be interested in a transfer of that portion of its line authorized in the three New Jersey Counties, south of Camden to Salem.

Many conversations were had between Mr. Polin and Mr. Millner during the latter part of 1957 concerning the attitude of Star towards Richards Freight. On one occasion Mr. Polin informed Mr. Millner that Laurel might be interested in a transfer of that portion of its line which was authorized in the three New Jersey Counties south of Camden to Salem.

Negotiations were commenced between Mr. Polin for Laurel and Mr. Millner for Richards Freight looking toward such a transfer. They entailed the commencement of the preparation of the Commission's Form BMC-44 for filing under Section 5 of the Interstate Commerce Act. This was a substantial project and could involve five or six weeks of work. The price mentioned for the transfer was approximately $15,500 to $16,000. However, the negotiations came to naught when Mr. Polin advised Mr. Millner that Laurel would not consider a direct transfer to Richards Freight because it had no confidence in its financial stability.

Early in January 1958 Mr. Polin telephoned Mr. Millner that Laurel intended to sell the rights they had been discussing to a Mr. Samuel Kellman of Philadelphia for $5,000 and since he, Mr. Polin, was going to be away and Mr. Millner was familiar with the situation he asked Mr. Millner whether he would see Mr. Kellman to help him with the transfer documents. Mr. Millner communicated to Mr. Polin his concern as to whether the interchange with Richards Freight would be continued. He was told by Mr. Polin that he could not speak for Mr. Kellman with respect to that but if Mr. Kellman succeeded in obtaining the operating authority it would be timely to discuss it with him.

Mr. Millner assented and Mr. Kellman called at his office it being understood that he was there pursuant to Mr. Polin's recommendation. Mr. Kellman told Mr. Millner that he had been in the transportation business for many years and had retired but was desirous of re-entering the business. Mr. Kellman was

rier moves his equipment over the interlining operator's route, but under the direction and control of the interline operator. Here, for example, the terminating point of Richards Freight route was Camden, New Jersey. At Riverside, New Jersey, near there, a point on the route of Star Transport Company (Star), the Richards Freight trailer would stop

for inspection. Afterwards it would travel on Star's line to Salem under the auspices of Star's certificate. Star would be compensated by Richards Freight in accordance with a concurrence by it to a proportion of the over all tariff from Canajoharie, New York, to Salem, New Jersey.

already known to Messrs. Bowes and Millner having called at their offices on one or more previous occasions. They indicated their willingness to aid him in the preparation of the necessary papers for the approval by the Commission for him to acquire the rights of Laurel to operate in Gloucester, Cumberland and Salem Counties, New Jersey. Mr. Kellman made known his further desire to conduct the proposed venture in the form of a New Jersey corporation. It was recommended that Mr. Kellman retain a Camden, New Jersey lawyer, Edwin Segal, Esq., whom he did consult.

At Mr. Kellman's direction Mr. Segal prepared and filed the necessary papers to form the New Jersey corporation to be known as Phil-Jer Freightways, Inc. (Phil-Jer). The certificate of incorporation was signed by Mr. Kellman, Mrs. Doris Steinberg, Mr. Segal's secretary, and her husband, Louis Steinberg, and was filed with the Secretary of State of New Jersey on January 15, 1958. Minutes of the meeting of incorporators and the first meeting of the directors, both held on January 22, 1958, disclose that Mr. Kellman, Mrs. Steinberg and Mr. Steinberg elected themselves directors and respectively president, secretary treasurer and vice president of the company. Certificates of stock were issued to Mr. Kellman and Mr. and Mrs. Steinberg, but the numbers of shares were left blank. It was quite obvious that Mr. and Mrs. Steinberg were dummy stockholders, officers and directors acting to meet the requirements of the Corporation Act of New Jersey.[6]

Following the incorporation, application form BMC–76 requesting the transfer of the rights in the three counties from Laurel to Phil-Jer was prepared in the office of Messrs. Bowes and Millner. The information required to be inserted in the application was supplied by both Mr. Kellman and Mr. Polin according to Mr. Millner.

The application was a printed form with blank spaces in which the required information was to be supplied. The following items pertinent to this case were answered and submitted as follows:[7]

"III. That the total consideration involved in the proposed substitution, transfer, or lease is $5,000 * * *."

* * * * * *

"(4) Are any funds to be borrowed to finance the proposed transfer, lease, or substitution?

<u>No</u> * * *."
(Answer yes or no)

* * * * * *

"IV. That full and complete information concerning the proposed transferee is as follows:

* * * * * *

"(5) If transferee is a trustee, receiver, or other like representative of the real party in interest:* <u>NO.</u>

"* Real party in interest refers to person in control of transferee."

* * * * * *

"(6) Is transferee or real party in interest, a rail, express, motor, water or pipe line carrier or a freight forwarder? <u>No.</u> * * *"
(Answer yes or no)

"(7) Is transferee or the real party in interest engaged in any other form of transportation or activity connected with transportation? <u>No</u> * * *."
(Answer yes or no)

* * * * * *

"8 (a) * * *."

"(b) Is transferee or the real party in interest in control of, or con-

---

6. The New Jersey Corporation Act provides:

"Any three or more persons may associate to form a corporation for any lawful purpose or purposes whatever, except as hereinafter in this section stated or otherwise provided by law, by executing, recording and filing a certificate of incorporation in the manner hereinafter provided." N.J.S.A. 14:2–1.

7. The underscored matter in each item is the answer.

trolled by, or affiliated with any individual, partnership, corporation or other organization engaged in any form of transportation or activity connected with transportation? No. * * *."

(Answer yes or no)

Mr. Kellman on behalf of Pen-Jer, and Mr. Pfeiffer on behalf of Laurel, executed the application under oath in Bala Cynwyd, Pennsylvania, on January 30, 1958. The application contained a "Certificate of Service" which was filled out to read as follows:[8]

"I, *Samuel Kellman,* do hereby certify that on the *30th* of *January 1958,* I served the foregoing application on *Thomas L. McClelland* Director(s) of District(s) No.(s) *2* Bureau of Motor Carriers, in which district(s) the headquarters of applicants are located, and on the Boards, Commissions, or Officials (or on the Governor where there is no Board, Commission, or Official) of the States of *New Jersey and Pennsylvania* in which States each of the applicants operates, by delivery in person (or mailing by registered mail) a true and correct copy of this application to each thereof.

Signed SAMUEL KELLMAN

.........................

Samuel Kellman"

Date *January 30th, 1958*

Mr. Kellman paid Mr. Segal for the incorporation of Pen-Jer, but Messrs. Bowes and Millner made no charge for the services they rendered in the preparation of the application.

Mr. Bowes testified that in April of 1958 Mr. Richards told him that he was "making negotiations" so that the stock of Phil-Jer could be acquired by his brother-in-law, Graham English, who had been a motor vehicle inspector for a large motor truck insurance company and had been ill, having suffered a very serious operation.[9] Through Mr. Millner and Mr. Polin negotiations were brought to a head for the purchase of the rights Phil-Jer expected to obtain from Laurel. In the middle of April 1958, Mr. Millner, representing Mr. Richards and Mr. English came to an arrangement with Mr. Polin for the purchase of the stock of Phil-Jer for $15,000.

Mr. Graham English was without funds with which to finance the project but Mr. Millner understood that Mr. Richards had offered to negotiate with New York sources so that Mr. English could obtain a loan of $15,000 to make the purchase.[10] The money was to be advanced by Nathan C. Biederman.

Mr. Richards's wife, trading under the name of Freight Lines Equipment Company, operated a service organization from which Richards Freight leased its equipment. It shared office space with Richards Freight. John Farrance had worked for it for a number of years. Prior to May 9, 1958, Mr. Richards through others, and eventually himself, informed Mr. Farrance that Mr. Graham English was to be president of Phil-Jer, his brother Paul English, vice president, and he, Mr. Farrance was to be secretary.

On May 9, 1958, at the direction of Mr. Richards, Mr. Farrance accompanied him from Scranton to New York City by automobile. On the way Mr. Farrance asked Mr. Richards why Richards Freight could not itself directly buy the Phil-Jer rights. Mr. Richards explained that "according to the ICC regulations if he had to go through as Richards Freight Lines it would take quite a while to get the rights, but by forming Phil-Jer it would take a short period of time in which to get the rights and at the same time, in the near future, if Richards Freightlines Equipment Company wanted to take over the rights they could."

8. The italicized matter was inserted in blank spaces provided therefor.

9. It appeared that Mr. English's illness was indeed serious for he died prior to the trial of the case.

10. Richards Freight was already deep in debt for loans negotiated through a client of Mr. Klein.

They arrived at 280 Broadway, New York City, early in the afternoon and met Mr. Graham English. All three had lunch together in the building and then went to the offices of Harris Klein, Esq., which were located in that building. William Biederman, Esq., another lawyer, and brother of Nathan C. Biederman, the prospective lender of the $15,000 to Mr. Graham English, also had offices there.

Meanwhile considerable communication had gone on between Messrs. Bowes and Millner, Mr. Harris Klein, and Mr. William Biederman for the purpose of preparing the many documents necessary to implement the transactions which had been planned, all looking toward May 9, 1958, as the date for closing the transactions.

Mr. Kellman and Mr. Polin went to Mr. Bowes's office in Newark on the morning of May 9, 1958. They had with them the books and records of Phil-Jer. Mr. Bowes gathered up the papers that had been prepared in his office and all three had lunch and went to the office of Mr. Klein in New York, arriving in the early afternoon. There they found Messrs. Richards, English, Farrance and William and Nathan C. Biederman.

The settlement of the various transactions projected for the meeting got under way. A large collection of instruments were executed and a profusion of actions were taken at that meeting. They included:

(1) The presentation to Samuel Kellman of a certified check for $15,000, which Nathan C. Biederman made to his own order and endorsed to the order of Phil-Jer Freightways, Inc. (The next endorsement appearing on the check is "Pay to the order of Samuel Kellman, Phil-Jer Freightways, Inc. by Graham English, Pres.) ;

(2) the delivery of a Phil-Jer resolution, a copy of Phil-Jer minutes and the affidavit of Mr. Farrance that a special meeting of the directors of Phil-Jer, purportedly consisting of Messrs. Graham and Paul English, and John Farrance had taken place at approximately 9:00 a. m., May 9, 1958, in South Orange, New Jersey,[11] which authorized Phil-Jer to borrow $15,000 from Mr. Nathan C. Biederman "for the purpose of providing funds to finance the purchase of certain interstate operating authority * * *" to execute a note to that effect, to execute a mortgage of the operating rights to secure the loan and to assign the operating rights as security for the loan;

(3) an agreement between Mr. Biederman and Phil-Jer for the latter to Borrow $15,000 from the former on a note in that amount payable in one year together with interest of $5,200 in weekly payments of $100;

(4) a note of $15,000 made by Phil-Jer to Mr. Nathan C. Biederman was signed on behalf of the corporation by Graham English as President, dated May 9, 1958, for one year with interest as provided in the foregoing agreement;

(5) an assignment by Phil-Jer; executed by Mr. Graham English to Mr. Biederman of the operating rights of Phil-Jer;

(6) a mortgage of Phil-Jer's operating rights was executed in favor of Mr. Biederman;

(7) a pledge of the issued stock of Phil-Jer was executed to Mr. Biederman to secure the loan to Phil-Jer; an unconditional guarantee for the payment of the principle of the note of $15,000 and the annual interest of $5,200 was executed by Mr. Richards to Mr. Biederman.

As an aftermath of the May 9, 1958 meeting Mr. Kellman disbursed the proceeds of the certified check of Mr. Bieder-

11. As far as Messrs. Farrance and Paul English were concerned their signatures were purely perfunctory. Mr. Farrance did not read or know the contents of the papers he signed. No meeting was held in South Orange, New Jersey, although purported minutes and affidavits concerning it were prepared in advance of May 9 in the office of Messrs. Bowes and Millner.

man for $15,000 in three checks made by him, each for $5,000—one dated May 9, 1958 payable to the order of Laurel Transfer; another, dated May 12, 1958, to Mr. Polin and the third, dated May 12, 1958, to Mr. Robbins. On his return to Scranton Mr. Richards directed the operating manager of Richards Freight to operate in conjunction with Phil-Jer on the interline from Salem to Riverside, New Jersey and thence to New York State. On May 15, 1958 Laurel delivered checks of $3,370.40 each to Messrs. Polin and Robbins respectively. They in turn surrendered to Laurel their certificates of stock in Laurel, each of which was for three shares. Mr. Kellman testified that all he got for his participation was $500 which Mr. Polin gave him about a week after the May 9th meeting.

With this background we may more readily deal with the issues raised by the appellant:

## I.

First, he contends that the second count of the indictment [12] should have been dismissed because (1) it was fatally defective in that it did not contain the "jurisdictional requirement" of an allegation that the offense was committed in the District of New Jersey, and (2) that there was failure of proof as to the venue being in New Jersey.

Appellant points to the failure of the second count of the indictment to specify that the offense charged therein was committed in the District of New Jersey and urges that the omission renders the count fatally defective.

The Federal District Courts have jurisdiction over all offenses against the laws of the United States, 18 U.S.C.A. § 3231. Therefore there can be no question that the District Court had subject matter jurisdiction over the offenses charged. Whether the District Court of New Jersey was the proper vicinage for the trial of Polin is another question. The Constitution provides that the defendant shall be tried in the District in which the crime was committed,[13] and the Federal Rules of Criminal Procedure likewise so provide.[14] However, it is quite clear that this right is considered a privilege that may be waived by failure

---

12. "Count II.
   "That on or about the 30th day of January, 1958,
   > Jacob Polin
   > Phil-Jer Freightways, Inc.
   > John Richards and
   > Richards Freight Lines, Inc.
   in a matter within the jurisdiction of the Interstate Commerce Commission, an agency of the United States, did knowingly and wilfully make and cause to be made material false statements and representations in connection with an application, Form BMC–76 to transfer a portion of a certificate of public convenience and necessity of Laurel Transport Corporation where in it was stated and represented in answer to Question III thereof that the total consideration in the proposed substitution, transfer, or lease was $5,000; in answer to Question III(4) that no funds were to be borrowed to finance the proposed transfer, lease or substitution; in answer to Question IV(5) that transferee was not a trustee, receiver or other like representative of the real party in

interest; in answer to Question IV(6) that transferee or real party in interest was not a motor carrier; in answer to Question IV(7) that transferee or the real party in interest was not engaged in any other form of transportation or activity connected with transportation; in answer to Question IV(8) (b) that transferee or the real party in interest was not in control of, controlled by or affiliated with an individual, partnership, corporation or other organization engaged in any form of transportation or activity connected with transportation, when, as the said Jacob Polin, Phil-Jer Freightways, Inc., John Richards and Richards Freight Lines, Inc. then and there well knew the statements and representations were false.
   "In violation of Title 18, U.S.C.A., Section 1001."

13. Article III, Section 2, Clause 3 and the Sixth Amendment of the Constitution of the United States.

14. Fed.Rules Cr.Proc. 18.

to make timely objection. This court has so held in United States v. Gallagher, 183 F.2d 342, 346–347 (3 Cir., 1950). See also Hanson v. United States, 285 F.2d 27 (9 Cir., 1960); Thomas v. United States, 267 F.2d 1 (5 Cir., 1959); United States v. Fabric Garment Co., 262 F.2d 631, 641 (2 Cir., 1958); Earnest v. United States, 198 F.2d 561 (6 Cir., 1952) and Rodd v. United States, 165 F.2d 54 (9 Cir., 1947).

■ The appellant raised the issue of the invalidity of the indictment for the first time as part of his motion to set aside the jury verdict. This was not timely. Such an objection must be made at least prior to the close of the Government's case, United States v. Fabric Garment Co., supra, at 641 of 262 F.2d, and perhaps before the trial begins, United States v. Jones, 162 F.2d 72, 73 (2 Cir., 1947). Hence the appellant has waived his right to assert that failure to designate the District of New Jersey as the place where the offense was committed rendered the second count of the indictment invalid.

■ For his assertion that the Government failed to prove that the venue was in New Jersey appellant relies upon a decision of this court,—United States v. Valenti, 207 F.2d 242 (3 Cir., 1953). That case is distinguishable from the one at bar, even though it involves as here, a violation of 18 U.S.C.A. § 1001. It dealt with the filing of an allegedly false non-communist affidavit pursuant to § 9(h) of the National Labor Relations Act. Judge Maris, writing for this court, held that:

> " * * * the crime denounced by section 1001 of title 18, read in the light of section 9(h) of the National Labor Relations Act, is the act of filing a false noncommunist affidavit with the National Labor Relations Board * * *. [A] false statement has not been made in a matter within the jurisdiction of the National Labor Relations Board, within the meaning of section 1001, until

the affidavit through its filing has become the basis for action by the Board." 207 F.2d at 244.

The only evidence as to where the affidavit had been filed, in Valenti, came from the Board's affidavit compliance officer who produced the original affidavit from the files of the Board in Washington, and stated that it came through the mail to the Washington office from a source unknown.

The Board's regulations required that the affidavit be filed with the Regional Director of the Board in Philadelphia. In the trial court a timely motion was made at the close of the Government's evidence for a judgment of acquittal, on the ground, inter alia, that the venue jurisdiction of the court had not been shown. It was denied. On appeal there was reversal, it being held that "it was obvious that the affidavit must have been filed with the Board either in Philadelphia, as the regulations provided, or in Washington. It could not have been filed in New Jersey since the Board had no regional director's office in that state." Venue laid in New Jersey was erroneous in Valenti because no offense was committed there.

In this case the Interstate Commerce Commission's regulations provided that not only shall a verified original and four copies be filed with the Commission in Washington, D. C., but that a copy shall also be delivered in person or by mail to the District Director in each district of the Bureau of Motor Carriers in which headquarters of the parties signing such application are located. In addition one copy thereof shall be delivered in person or by mail to the Board, Commission, or official having authority to regulate the business of transportation by motor vehicle of each state in which are located the headquarters of the applicants or to the Governor where there is no such agency. 49 C.F.R. 179.2. The certificate of service appearing on the application form BMC–76, admitted in evidence, attested to the fact that Mr. Kellman had

complied with the regulation.[15] Subsequently evidence disclosed that the application was duly granted by the Commission. Unlike the filing requirements in Valenti, which fixed either Philadelphia or Washington as the place for the delivery of the affidavit, here copies of the application were required to be filed in three places including one in the District of New Jersey. The analogy sought to be drawn by the appellant between Valenti and this case fails and the proofs offered by the Government sufficiently supported the District of New Jersey as the proper venue of the second count of the indictment.

## II

Appellant next urges that the evidence was insufficient to sustain a conviction on any of the three counts of the indictment; that the proofs "negated the allegations"; and that his motion to set aside the conviction and for judgment of acquittal should have been granted.

Appellant submits that no proof was adduced that he was a stockholder or owner of Phil-Jer or that he had any interest in Richards Freight and on the contrary the proofs indicated that any activity in which he participated whereby the transfer of rights from Laurel to Phil-Jer and from Phil-Jer to Graham English was solely in his capacity as "I.C.C. practitioner". He contends that the Government's case was barren of any proof that he entered into a conspiracy to falsify the statements contained in the application form BMC–76 or to accomplish and effectuate the control and management in a common interest of Richards Freight and Phil-Jer without the approval and authorization of the Commission. There was a like lack of proof, he argues, that he acted as an aider or abettor in the achievement of the two purposes last mentioned.

■ All of the evidence presented was circumstantial, none of the witnesses having admitted the existence of any plans or schemes to accomplish the offenses charged. However, it is fundamental that the offense of conspiracy is rarely provable by direct evidence and that conviction thereof may be based upon circumstantial evidence. Delli Paoli v. United States, 352 U.S. 232, 236, n. 4, 77 S.Ct. 294, 1 L.Ed.2d 278 (1956).

■ The appellant was one of the owners of Laurel. Except for the operational activities, managed by Mr. Pfeiffer, the appellant controlled those matters of transfer and all affairs of Laurel involving the Commission. He was, by reason of his representation of Star Transport Company, in position to intimately know the need of Richards Freight for the rights necessary to complete its route from Salem, New Jersey to Canajoharie, New York. At one time he commenced the negotiations with Mr. Millner, the representative of Mr. Richards and Richards Freight, for a transfer of these rights directly from Laurel to Richards Freight at a price in excess of $15,000. In the face of this he arranged the sale of Laurel's rights to Samuel Kellman for $5,000, or a price so low that when Mr. Millner was so advised by appellant he was moved to ask why they were being sold for that figure. The relationship between appellant and Mr. Kellman was that of a long time friend. It

---

15. Some confusion surrounds form BMC–76, as submitted to this court. A purported copy appears in the appellant's appendix and contains a handwritten notation following the certificate of service by Mr. Kellman, which reads:
"Filed—Jan. 31, 1958—in DKt. No. MC-FC-60942 Filed with Office of I.C.C. in Washington, D.C. Sec. of I.C.C.
                "Harold D. McCoy"
This handwritten notation appears to be accepted as authoritative by both counsel for appellant and the Government.

It is information that obviously could not have been on the certificate when filed by Mr. Kellman and does not appear on the photostatic copy of the original application form BMC-76, certified under the seal of the Interstate Commerce Commission and admitted in evidence as Government Exhibit G-6. The copy in the appendix is not a precise copy of Government Exhibit G-6 as it purports to be, for in addition to the writing to which reference has been made it contains other unexplained notations.

was so close that Mr. Kellman used appellant's office as his mail and telephone address.

After discussion with and at the suggestion of appellant, Mr. Kellman consulted Messrs. Bowes and Millner of Newark, New Jersey, the representatives of Mr. Richards and Richards Freight, concerning the making of application form BMC–76 for the transfer of the rights from Laurel to him. Mr. Kellman candidly conceded that the creation of the corporation Phil-Jer was simply an alter ego for him as transferee of the Laurel rights.

Phil-Jer never owned any property whatsoever. Its only right resembling an asset was the order of the Commission granting to it approval to receive the transfer of Laurel's rights to operate in three New Jersey Counties on condition that the transfer would be consummated within 90 days from the date of the order—March 11, 1958. That order was made pursuant to the application on form BMC–76 of the Commission executed by Laurel and Phil-Jer.

Nothing further was done by Phil-Jer from the time of the Commission's order until the simultaneous transactions on May 9, 1958. Mr. Kellman testified that because of illness he had changed his mind about exploiting the rights Phil-Jer was to receive from Laurel; that he told appellant he could resell them for any price in excess of the $5,000 which he was obligated to pay Laurel; and that appellant's arrangement of the sale from Phil-Jer for $15,000 was entirely satisfactory even though it meant no profit to him, Mr. Kellman.

Meanwhile Richards Freight was operating under a lease of Laurel's rights. Although Richards Freight eagerly wanted to acquire these rights permanently, it did not want to go through what it regarded as a long drawn out proceeding before the Commission for approval to acquire them. Mr. Graham English, brother-in-law of Mr. Richards, then appears upon the scene in the role of purchaser of the stock of Phil-Jer, notwithstanding his complete lack of financial capacity.

Mr. Richards and Richards Freight were in exceedingly tight financial straits.[16] Yet Mr. Richards and Richards Freight undertook complete financial responsibility for the repayment of the loan from Mr. Biederman of the full $15,000 together with interest at the rate of over 33⅓% per annum. This formed the consideration for the sale by Phil-Jer and enabled Mr. Kellman to pay Laurel $5,000, in which appellant had a substantial interest, appellant $5,000 personally, and Mr. Robbins $5,000, leaving nothing for himself. At about the same time appellant and Mr. Robbins were paid for their interest in Laurel and Mr. Pfeiffer was left as the sole owner of Laurel less its rights to the three counties it had transferred. Shortly thereafter Mr. Kellman received $500 from appellant for his services.

From these circumstances set forth in detail earlier herein the jury had ample evidence from which to make the reasonable inference that there was a scheme afoot to pass the rights in question from Laurel to Richards Freight for $15,000 and that appellant was a part and parcel of the scheme if not its chief engineer.

There was also sufficient evidence for the reasonable inference that filing the application form BMC–76 by Phil-Jer was a maneuver in the scheme and contained six false statements as charged in the second count of the indictment. These were: (1) that the consideration was $5,000 for the transfer, when it actually was $15,000; (2) that no funds were to be borrowed to finance the transfer, when in fact the entire $15,000 was borrowed; (3) that the named transferee, Phil-Jer, was the real party in interest, when in fact Richards Freight was the real party in interest; (4) that the real party in interest was not a motor carrier, when in fact Richards Freight

16. By the time Richards Freight was brought before the court for sentence it was in bankruptcy proceedings under Chapter XI.

was a motor carrier; (5) that the real party in interest was not engaged in the transportation business, when in fact Richards Freight was so engaged; and (6) that the transferee was not in control or controlled by any individual or entity engaged in any form in the transportation business, when in fact the transferee, Phil-Jer, was a mere sham and was effectively controlled by Richards Freight through the medium of Mr. Graham English, brother-in-law of Mr. Richards.

There was evidence to justify the jury's inference that appellant was inextricably intertwined in the entire project of passing Laurel's rights into the control of Richards Freight from the time that he learned of its need for them through his representation of Star Transport. It was the decision of appellant alone that Laurel should not sell to Richards directly for over $15,000, but that a sale should be made to Mr. Kellman for $5,000. It was appellant who suggested to Mr. Kellman to go to Messrs. Bowes and Millner to prepare the application for transfer. It was appellant who furnished some of the information that went into the application. It was appellant who journeyed with Mr. Kellman on May 9, 1958 to the office of Messrs. Bowes and Millner in Newark and then to the offices in New York where he was present throughout the execution of the ramified transactions that ultimately resulted in placing in his hands $5,000 for Laurel, in which he had a substantial interest, $5,000 for himself, and $5,000 for his associate, Mr. Robbins. The appellant was not only an experienced practitioner in Commission matters but according to Mr. Kellman he acted as a broker for the transfer of territorial rights to operate in interstate motor transportation. The appellant was in position to be fully cognizant of the need of Richards Freight for the right to operate in the three New Jersey Counties required to complete its route from Salem, New Jersey to Canajoharie, New York. He was equally fully in control of the disposition of Laurel's rights to fulfill such need and to launch their transfer in the devious channels which would carry them into the control of Richards Freight as completely as if it owned them without disclosing that purpose to the Commission and receiving its approval as required by law.

There is no difficulty in concluding that the evidence presented to the jury sustains the Government's theory that the establishment of Phil-Jer, the sale from Laurel to it of the rights, and then the sale of Phil-Jer to English were nothing more than steps in a plan to avoid obtaining the Commission's approval of a direct transfer to Richards Freight of these operating rights, and that all the intermediary parties such as Kellman, Farrance, the brothers English, etc. were only pawns to accomplish this purpose.

The evidence was not only sufficient to warrant the verdict of the jury that the appellant was guilty of the offense of conspiracy, as charged in the first count of the indictment, but that he was likewise guilty of the substantive offenses in the second and third counts. If his participation in these counts as a principal is open to any question there can be no doubt of the jury's justification in determining that he was an aider and abettor and thus guilty as a principal under 18 U.S.C.A. § 2(a).[17]

A review of the entire record in the case and a consideration of the careful charge of the Trial Judge reveals no reversible error. Neither did he err in denying the motion for judgment of acquittal or new trial.

The judgment of conviction on all three counts will be affirmed.

17. "§ 2. Principals
"(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal." 18 U.S. C.A. § 2(a).