UNITED STATES of America,
Appellee,

v.

Raymond BINET, Appellant.

No. 892, Docket 34526.

United States Court of Appeals,
Second Circuit.

Argued July 15, 1970.

Decided Jan. 13, 1971.

On Rehearing April 12, 1971.

For opinion on application for entry of judgment, see 442 F.2d 384.

Jon A. Sale, Walter M. Phillips, Jr., Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty., for appellee.

Robert H. Levy, Milton Adler, New York City, for appellant.

Before WATERMAN, MOORE and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal from an adjudication of juvenile delinquency entered in the United States District Court for the Southern District of New York after a jury trial presided over by Judge Cooper. Appellant was charged in one count with committing an act of juvenile delinquency, 18 U.S.C. §§ 5031–5037, in that he violated 18 U.S.C. § 1708 by having knowingly possessed stolen U.S. mail knowing the same to have been stolen. After the jury's verdict of guilty appellant was committed by the court to the custody of the Attorney General for a period of five years. He is presently serving that sentence at the Robert F. Kennedy Memorial Center, Morgantown, West Virginia.

Appellant contends that his oral admissions made to an Assistant United States Attorney after his arrest and prior to his arraignment were unconstitutionally obtained and that the introduction of these admissions into evidence against him at trial, over his objection, was reversible error. We agree. For reasons to be elaborated later we reverse appellant's conviction and remand the case for a new trial below.

Appellant, a 15-year-old in the ninth grade, was arrested at the scene of a mail theft in the company of his older brother, Milton Gomez, and his brother-in-law, Hector Vega. A government

agent, John Hedlund, in the employ of the Postal Inspection Service, testified that at 5:55 A.M. on January 5, 1970, he observed a black sedan occupied by three passengers parked in front of a U.S. mail trailer located near the corner of 37th Street and Broadway, New York City. He saw two of the passengers emerge from the car, walk across the street and enter the lobby of a building. About 10 minutes later the two returned to the sedan, which shortly thereafter was driven down the street and parked in front of another mail trailer located near 7th Avenue. As he started to walk toward the scene he observed three individuals standing on the sidewalk near the door of the mail trailer, and he saw that the door of the truck was open and that sacks of mail were being dragged from the truck to the car. He could not identify appellant as one of those taking part in this phase of the mail theft operation.

As the automobile started to pull away with the mail bags Agent Hedlund moved in, drew his revolver, and called upon the driver to stop. Hedlund then ordered Gomez, who was driving, and appellant, who was "laying on the back seat," to get out of the car and he placed them under arrest. Vega, having fled the scene on foot, ran into Hedlund's partner down the street and he was arrested. Three sacks of United States mail were found in the trunk of the sedan.

Binet, Gomez and Vega were taken by the arresting officers to the General Post Office where the group arrived at approximately 7:00 A.M. The three defendants were first advised of their constitutional rights and were then "processed" by having their pictures taken and their personal data recorded. At about 9:00 A.M. appellant was given an injection of one cubic centimeter of methadone at a dispensary located in the Post Office building. At about 10:00 A.M. the three were taken to the United States Court House and at 2:00 P.M. appellant was interrogated by an Assistant United States Attorney, Jon Sale, in the presence of postal inspector Edward Lyons, an inspector Burke, and a probation officer, James Gannon.

At the trial Inspector Lyons was the Government's only witness to testify about this interrogation, and in answer to District Attorney Sale's questions at trial was about to relate this pre-trial question-and-answer conversation between Sale and Binet when the defense moved to suppress any revelation of the conversation between the juvenile and the prosecutor and called for a voir dire.[1] The trial judge excused the jury and after taking testimony from Inspector Lyons and the appellant ruled that testimony relative to the colloquy would be admissible.

Thereupon the jury was recalled and Inspector Lyons testified in open court that Sale informed the defendant that he had the right to have an attorney, to consult with an attorney, and to have the attorney present, and also that if he did not have funds to retain one, one would be appointed to represent him; that Sale asked Binet if he understood all this and that Binet replied that he did. Lyons's further testimony, elicited by Sale, follows:

[Mr. Sale] said, [to Binet] "Understanding your rights as I have explained them to you, do you wish at this time to give me some information about your background and your view of the facts?"

Q. [by Mr. Sale] Inspector Lyons, did the defendant answer that question? A. He did.

Q. And what did he say? A. He said yes.

1. Binet was a youth of fifteen, but, despite his years, was evidently a heroin user and after having taken heroin at approximately 3 A.M. received an injection of Methadone sometime after 7 A.M. A ground advanced for the suppression of the statements he made shortly after 2 P.M. was that the injection affected the reliability of the statements. The trial judge denied the motion to suppress and for the reasons appearing hereafter we find it unnecessary even to reach this issue or to review the ruling thereon.

Q. Did the defendant proceed to give any information about his background? A. He did.

Q. Did the defendant give any statement concerning his version of the facts? A. He did.

Q. Would you tell the ladies and gentlemen of the jury what the defendant said? A. He said that he, Gomez and Vega had discussed stealing mail. He was asleep while they broke into the mail truck. They pulled the three sacks out of the truck. He knew the sacks were stolen. He got out of the car, took one of the stolen sacks and put it in the trunk of the car. He knew it was stolen. He did this, because if he didn't help he wouldn't get any money. He said he was fine, and he understood.

Later that afternoon when the officers had concluded this interview with the lad they took him before a U.S. Commissioner where he was arraigned. Counsel from the Legal Aid Society of New York was assigned to assist him in his defense.

After Inspector Lyons had testified to his recollection of the inculpatory admissions which appellant had made, the Government rested and the juvenile took the stand in his own behalf. He testified that he lived with his mother, sisters and brothers, a family of ten, in a three room apartment, that he used heroin about four times each week, and that he had started his drug habit at the age of fourteen. Appellant related that after midnight, during the early hours of the morning of January 5, he had been in a restaurant in New Jersey "shooting up dope" and had returned to his home around 3 A.M. After sleeping for a while he was awakened by his eighteen-year-old brother. Leaving the apartment they took a subway to the vicinity of 37th Street where they stole a black sedan, drove it down the street and parked it next to a mail trailer. Because the heroin he had taken that morning had made him sleepy he went to sleep in the back seat of the car. He admitted, however, that later on he had pushed one of the mail sacks that was hanging out of the trunk inside the trunk thinking that it belonged to his brother. He then closed the trunk, got back into the car, and lay down on the back seat. Shortly thereafter he was arrested. He denied that he knew that Vega and Gomez planned to break into a mail truck and attempted to convey by his testimony that he was unaware of the implication of his companions' activities at the mail truck scene.

Although it seems obvious that appellant was a participant in a plan to steal from the U.S. mails, a plan happily thwarted by alert and conscientious postal inspectors at the very moment the plan was about to be consummated, it is equally obvious that the introduction against him at his trial of the inculpatory admissions he made require that his conviction be reversed although no evidence was adduced at the voir dire before the trial judge that the juvenile was not arraigned in accordance with the statute which makes the juvenile's statement inadmissible. Similar admissions made by adults under the same circumstances and testified to at trial by government officers as part of the Government's direct case would not have the same effect, but here we are charged with respecting the congressional purpose to protect juveniles against themselves as that purpose is expressed in 18 U.S.C. § 5035.

In United States v. Glover, 372 F.2d 43 (2 Cir. 1967), a not too dissimilar case on its facts from this one, we reversed a finding of juvenile delinquency and commitment therefor. We remanded that case for a new trial. We held it reversible error to admit into evidence a sworn incriminating written statement made by the juvenile accused to a postal inspector at 9:20 in the morning after the juvenile had been arrested at 6:00 P.M. the previous night and during the interim had been detained in the juvenile unit of the Federal House of Detention until 9:00 A.M. There, as here, the accused had been fully informed of his constitutional rights and claimed to have understood them prior to the questioning. After

making the incriminating statement Glover was taken to the United States Courthouse by 10:00 A.M. and was arraigned before a United States Commissioner between 10:30 and 11:00 A.M. In holding that a reversal was predicated on the failure to conform to the Juvenile Act, 18 U.S.C. § 5035, we stated:

> Section 5035 evidences a strong Congressional concern with the protection of the rights of juveniles. Unless the juvenile is taken *"forthwith"* before a committing magistrate, detention shall not "be for a longer period than is *necessary* to produce the juvenile before a committing magistrate." There is here no hint of any purpose to allow detention for any other objective than prompt arraignment, before a judicial officer, so that the magistrate may explain and protect the juvenile's rights—among others, the right against compulsory self-incrimination and the right to the assistance of counsel. The Act makes plain the concern of the Congress that those of adolescent age be kept separate from hardened adult offenders. We may assume that it was no less concerned with the greater need of the young and inexperienced for independent, unbiased advice as to the right to counsel and the right to refrain from self-incrimination, when interrogated by the police authorities.

Miranda v. State of Arizona, 384 U. S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1965), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." In the case of a juvenile, compliance with the mandate of the Juvenile Act should be the minimum requirement of such safeguards. Treatment of an accused juvenile after arrest as a chattel in the possession of the officers, deliverable at will to the inspectors' officers for interrogation is a plain departure from the command of the statute for forthwith production of the juvenile before a magistrate. Statements taken while the statute is being ignored in this fashion must be held inadmissible. (Emphasis as in opinion.) 372 F.2d at 46–47.

The Government would distinguish *Glover* on the ground that the eight-hour daytime custodial detention of Binet was a "necessary period" in order to "process" him in a normal manner. However, the record in this case makes plain that appellant was taken to the General Post Office sometime about 7:00 A.M. and, shortly thereafter, after being warned of his rights, was first processed, and then, sometime during the morning, was given a shot of Methadone, all within a space of three hours. At approximately 10:00 A.M. he was delivered to the United States Court House when, of course, a U.S. Commissioner at that hour was presumably available in the building, where he remained until approximately 2:00 P.M. before being taken before Mr. Sale. The record does not disclose what was done with appellant at the Court House during that time. At 2:00 P.M., instead of being taken before a Commissioner and given "unbiased advice as to the right to counsel and the right to refrain from self-incrimination," *id.* at 47, he was taken before an Assistant United States Attorney and questioned in the presence of two other law enforcement officers. The Government alleges that the only purpose of this sophisticated questioning was to obtain "background information," but it was not until after an oral confession was secured that appellant was taken before a Commissioner.

There was no need to question appellant for investigatory purposes for the participants in the crime were caught while perpetrating it. And Assistant U.S. Attorney Sale's question: "Do you wish to give me * * * your view of the facts," followed by the introduction of Binet's answers about the "facts" at the suppression hearing and at trial, belies any claim that only "background information" was sought from this boy, so interrogated after an eight-hour deten-

tion and then questioned in the absence of parent or counsel.

No satisfactory explanation has been advanced to justify the custodial delay from 10 A.M. to 2 P.M. and, as we, quoting from Mallory v. United States, 354 U.S. 449, at 454–455, 77 S. Ct. 1356, 1 L.Ed.2d 1479 (1957) said, in United States v. Middleton, 344 F.2d 78 (2 Cir. 1965), at 81–82, a case involving a delay in the arraignment of an adult person,

> Any period of delay becomes unreasonable if used, as here, "to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements" to support the arrest and ultimately the defendant's guilt; "the delay must not be of a nature to give opportunity for the extraction of a confession."

See, however, where delay was found to be a justifiable one, United States v. Hall, 348 F.2d 837, 842–843 (2 Cir. 1965).

In the case of an accused juvenile the Government has a heavy burden to demonstrate that a confession taken from the accused was not the product of a period of detention or custody "for a longer period than is necessary to produce the juvenile before a committing magistrate." 18 U.S.C. § 5035. That burden was not met here.

Reversed and remanded for a new trial.

MOORE, Circuit Judge (dissenting):

This obvious miscarriage of justice results from a misconception of the facts and from an ill-founded (and unintended—I hope) decision, the effect of which is to hold that a crime, no matter how overwhelmingly proved, can be justified if committed by a fifteen-year-old boy who admits to the use of narcotic drugs.

First, the facts. The jury was entitled to believe that the Government Postal Service agents observed the three mail robbers, including this defendant, during the span of their operations, i. e., the casing of the neighborhood, the parking of their stolen car near the mail truck, the removal of the mail sacks from the truck to their car and their attempted getaway.

Despite the trial court's voir dire decision in holding the alleged involuntary confession to have been voluntary, the majority reappraise the facts in an endeavor to adjust them to facts of other cases which have little bearing upon the proper decision here. Thus, the impression is given that appellant was merely "laying on the back seat" whereas, in fact, he with his older brother had traveled by subway from his home to 37th Street, Manhattan, and proceeded to participate in the events just described. Because he had allegedly taken some form of narcotic drug prior to the robbery, at about 9:00 A.M., he was given an injection of methadone. The three defendants were brought to the United States Court House for arraignment and questioning about 10:00 A.M.

Binet himself took the stand. The jury had ample opportunity to assess his credibility in relation to that of the Government agents. He made no claim of abuse, threats or any other coercion. The very hyperbole in applicant's brief, reflected in the majority opinion that the record does show "an effort to obtain the confession of a drugged, 'sleepy,' fifteen-year-old lad held for some eight hours without the presence of a lawyer or relative," is not a distortion of fact— it is completely contrary to fact. There was no evidence that at the time of interrogation Binet was in a "drugged" condition. The methadone by his own admission caused him to feel better and his manner and responses during the questioning were alert. He was twice given *Miranda* warnings. There was no eight-hour holding.

This case, however, by no means stands upon Binet's inculpatory statement; it was but a part of the testimony overwhelmingly pointing to guilt. Therefore, the error of the majority is to be found in their reliance on cases such as United States v. Glover, 372 F. 2d 43 (2d Cir. 1967) and United States v. Middleton, 344 F.2d 78 (2d Cir. 1965).

*Glover* was decided less than a month before the Supreme Court handed down its decision in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) which greatly legitimatized the doctrine of "harmless error." It is, therefore, most understandable that the *Glover* court did not seriously address itself to the question of harmless error. However, after *Chapman* came Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, decided on June 2, 1969. In that case, the Supreme Court signalled a definite departure from automatic reversal toward acceptance, if not encouragement, of broadened use of the harmless error rule in cases involving questions of fundamental constitutional dimension. The effect of that decision was pointed up by Mr. Justice Brennan, in his dissent, 395 U.S. at 255, 89 S.Ct. at 1729, in which he clearly recognized the meaning and manifold implications of the Court's decision in *Harrington;* *i. e.,* the Court did not intend to limit its narrowing of *Chapman* to the *Bruton* problems there presented when he said:

> "The Court today overrules Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967), the very case it purports to apply. Far more fundamentally, it severely undermines many of the Court's most significant decisions in the area of criminal procedure.

> \* \* \* \* \*

> "*Chapman,* then, meant no compromise with the proposition that a conviction cannot constitutionally be based to any extent on constitutional error. The Court today by shifting the inquiry from whether the constitutional error contributed to the conviction to whether the untainted evidence provided 'overwhelming' support for the conviction puts aside the firm resolve of *Chapman* and makes that compromise. As a result, the deterrent effect of such cases as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1965); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), on the actions of both police and prosecutors, not to speak of trial courts, will be significantly undermined."

The majority today quotes heavily from *Glover,* 372 F.2d at 46–47, with particular emphasis on that portion of the opinion which seeks to establish for juveniles in custody minimum procedural safeguards greater than those guaranteed to all other similarly situated citizens by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Even assuming *arguendo* that the *Glover* court was correct in making a finding of congressional purpose sufficient to justify conferral of the extremely protective rules of exclusion and automatic reversal under then-existing law, something which I seriously question, I find it anomalous indeed that this court today would treat matters relating to rights of fundamental constitutional importance with less favor than cases involving statutorily created rights intended to secure the same level of procedural protection for a special class of citizens deemed to be in special need of it. I cannot understand how the majority can distinguish the application of so neutral a concept as "harmless error" on the basis of age or on the basis of a "congressional purpose to protect juveniles against themselves."

In my opinion the proper standard by which this court should be guided under the latest Supreme Court pronouncement on the subject is whether the evidence adduced at trial is "so overwhelming that unless we say that no violation of [18 U.S.C. § 5035] can constitute harmless error [as this court seems to say today], we must leave this [federal adjudication] undisturbed." Harrington v. California, 395 U.S. at 254, 89 S.Ct. at 1729.

In summary, the evidence establishing Binet's guilt clearly was "overwhelm-

ing." A Postal Inspection Service Agent saw Binet, his brother and brother-in-law next to the mail trailer from which the stolen mail sacks were taken. Binet was arrested in a car which he knew to be stolen, in the trunk of which the stolen mail sacks were discovered. Binet admitted at trial that he pushed one of the mail sacks into the car trunk, but offered the implausible story that he believed the mail sack belonged to his brother and not to the U.S. Government. This version of the facts, if disbelieved by the jury, constitutes affirmative proof in the Government's case as part of Binet's "guilty consciousness." United States v. Fabric Garment Co., 262 F.2d 631, 639 (2d Cir. 1958), cert. denied, 359 U.S. 989, 79 S.Ct. 1117, 3 L.Ed.2d 978 (1959).

There can be little question but that the fruits of any alleged Government failure to comply with § 5035 were clearly harmless beyond a reasonable doubt.

I would affirm the judgment.

### On Petition for Rehearing

**PER CURIAM:**

Subsequent to the filing of our opinion on January 13, 1971, reversing the appellant's conviction and remanding the case for a new trial the Government filed a petition for rehearing which the panel has unanimously granted.

Alleging that the relevance of 18 U.S.C. § 5035 was not called to the attention of the trial court by either party, the Government seeks an opportunity to present evidence with reference to whether the pre-arraignment custodial detention of appellant was not "for a longer period than [was] necessary to produce the juvenile before a committing magistrate," 18 U.S.C. § 5035.

A panel majority modifies our mandate. While retaining jurisdiction over the case in the appellate court, the case is remanded so as to provide the Government the opportunity it desires, the evidentiary hearing to be limited to the Government's request, that of developing facts bearing upon the issue of delay prior to arraignment.

Circuit Judge Waterman considers the grant to the Government of this "second bite of the apple" while the case is on appeal as setting a most extraordinary precedent in view of the fact that the Government failed to carry its burden of demonstrating its compliance with 18 U.S.C. §§ 5031–5037 at the first trial and, by our present mandate, has already been given the opportunity of carrying that burden at the new trial we have ordered. He would deny the relief the Government seeks by its petition.