**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**INDIAN BOY X, Defendant-Appellant.**

No. 76–3301.

United States Court of Appeals,
Ninth Circuit.

Dec. 2, 1977.

Rehearing Denied Feb. 27, 1978.

Irwin H. Schwartz, Seattle, Wash., for defendant-appellant.

John C. Merkel, U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before CHAMBERS and MERRILL, Circuit Judges, and HOFFMAN *, District Judge.

WALTER E. HOFFMAN, District Judge:

The major issue before us is whether the juvenile appellant's murder confession should have been suppressed due to non-compliance on the part of tribal police and Federal Bureau of Investigation (F.B.I.) agents with 18 U.S.C. § 5033, which requires the "forthwith" presentation of an arrested juvenile before a United States Magistrate. Appellant, Indian Boy "X," made a full confession of both an assault of

* The Honorable Walter E. Hoffman, Senior United States District Judge, Eastern District of Virginia, sitting by designation.

one victim and a murder of another in an interview at an F.B.I. office in the State of Washington on Friday, May 14, 1976, five days after the incident.[1]

The crimes were apparently nearly contemporaneous. The appellant admitted the assault to a tribal police chief at about noon on May 14. (Tr. 35). The second confession to the assault was made at about 2:15 p. m. the same day at the F.B.I. office. (Tr. 116–119). The murder confession followed at about 3:00 p. m. at the F.B.I. office. (Tr. 123). Appellant's parents were present at the time of waiver of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights, and at the time of the confessions. The appellant was not brought before a United States Magistrate until the following Monday, and now argues that this sequence of events violated his statutory right to a speedy arraignment.[2] 18 U.S.C. § 5033. A pretrial motion to suppress the murder confession was heard and denied upon the court's finding that the authorities acted reasonably and appropriately.[3] A demand for jury trial, under the Juvenile Delinquency Act, was also denied. No issue has been raised as to the competency of "X" to stand trial. At the conclusion of a four-day trial (not continuous), the court declared the appellant to be a juvenile delinquent, based on findings that he committed acts that, if committed by an adult, would have amounted to a second degree murder and a separate assault with a dangerous weapon. (Tr. 126). After a study pursuant to 18 U.S.C. § 5037, the trial court committed "X" to the Attorney's General's custody

until his twenty-first birthday. At the time of argument, we were told that the appellant is in custody at a mental hospital in Napa, California. We affirm.

The murder and assault occurred in the early morning hours of May 9, 1976. The setting was the scene of a party located on an Indian reservation in the State of Washington. The murder victim had been bludgeoned about the head and stabbed 108 times. The assault was committed with a hunting knife. The appellant was considered a suspect almost immediately. After several previous interviews on the reservation by Bureau of Indian Affairs police and the F.B.I., at each of which he denied committing either the murder or the assault, appellant "X" was visited at his family's home on the reservation on May 14 at about 11:45 a. m. by the chief of the tribal police, Smith.[4] Smith admittedly visited "X" to "see if ["X"] would make a confession." (Tr. 84). "X" was not in custody at this time and the crimes were only under investigation. Smith, the appellant, and the appellant's mother then went into the boy's bedroom where Smith, in great detail, advised the boy of his *Miranda* rights, and explained each to him, using vocabulary a juvenile could understand. (Tr. 36–39).

After securing from both the boy and his mother assurances that they understood what he had told them, Smith asked "X" if he wished to talk to him. "X" nodded his head and said "yes". (Tr. 39). Smith proposed to tell them his theory of the crime,

1. The appellant does not contest the propriety of admitting at trial the confession to the assault made by appellant to a tribal police chief at the appellant's home prior to going to the F.B.I. office where the confession was clarified and repeated.

2. Analysis should properly be focused on that period of time which elapsed between the appellant being taken into custody and appellant making the confession as only pre-questioning delay is relevant. *United States v. Montes-Zarate,* 552 F.2d 1330, (9th Cir. 1977). Appellant makes no point as to any delay between 4:30 p. m. on Friday and the following Monday afternoon when he appeared before the Magistrate.

3. The trial court admitted the murder confession in evidence, finding as follows:

"The only conclusion I can draw from looking at it again, as I say, in the totality of the circumstances is that the authorities at all times here acted entirely reasonably and appropriately with due concern for the rights of the defendant, and I find that the admissions were knowingly and voluntarily and willingly entered." (Tr. 179)

4. Fictitious name. We have attempted throughout this opinion to protect the identity of the appellant in the spirit of the Juvenile Delinquency Act.

which was that "X" had seen Jones[5] kill Miss Brown[6] and had then attacked Jones in retaliation. (Tr. 39–40). The appellant's mother asked "X" if Smith's theory was correct. "X" said that it was correct, and proceeded to embellish the story while retaining its basic outline. (Tr. 40–43). At the conclusion of this interview, which took approximately fifteen minutes, Smith told "X" and his mother that he would have to take "X" down to the office of the F.B.I. and give "X" the opportunity to repeat his narrative of the events to them.[7] (Tr. 44). The nearest federal magistrate was forty-five minutes away from the site of this confession. Smith contacted the F.B.I., and after picking up the boy's father at the request of the appellant's mother, drove the family to the F.B.I. office, which was located in a nearby city.

After arriving at the F.B.I. office, appellant, his parents, and Smith were joined in a conference room with the tribal administrator, George Hill,[8] and two F.B.I. agents. "X" and his father were advised of the appellant's rights, and expressed understanding of such rights. (Tr. 51–55). Appellant's father asked if "X" could stop answering questions at any time, and was answered in the affirmative. (Tr. 89). Appellant and his father each signed a waiver form. (Tr. 88). Smith then asked appellant to repeat to the F.B.I. agents what appellant had earlier told Smith. (Tr. 54–55). After he had done so, the appellant was questioned by the F.B.I. agents as to

what he had seen, and about further details surrounding the stabbing of Jones. (Tr. 58–60). At this point, the appellant's father asked the F.B.I. agents and Smith to leave the room. Remaining in the room were Hill, "X," and his parents. Hill then asked "X" if he had killed Miss Brown, to which the appellant did not reply. (Tr. 92.). The appellant then asked Hill what the F.B.I. laboratory analysis of his clothing would reveal. Hill explained that it could detect hair follicles and blood types. He then asked "X" if he was concerned that some of Miss Brown's blood type would be found on his clothing. "X" did not respond. The appellant's mother asked him if he had killed Miss Brown, and he replied that he had. (Tr. 93).

Appellant's father asked Hill about an attorney, and about what would happen at this point. Hill answered that a colleague was attempting to reach the Public Defender's office in the local town to arrange for an attorney. Hill was careful in explaining to "X" and his parents that they had the option of continuing the confession to the F.B.I. agents and Smith, or not saying anything at all until an attorney arrived. (Tr. 94).

At the conclusion of this conference, Hill asked the law enforcement officers to reenter the room. He told them nothing about the confession. The F.B.I. agent who had been conducting the interrogation told the group that the agents were at a point of obtaining a confession or releasing "X."[9] Appellant's father then advised the group

---

5. Fictitious name.

6. Fictitious name.

7. The F.B.I. has concurrent jurisdiction with the chief of tribal police in felony matters on the reservation. (Tr. 79); see generally 18 U.S.C. § 3242.

8. Fictitious name. Upon the commission of a felony on the Indian reservation, Hill assumes the role of a police administrator. Acting in this capacity, Hill has the duties of contacting the various authorities, particularly the F.B.I. and the Bureau of Indian Affairs, as to the felony, and of informing them as to investigation proceedings and the results thereof. Hill, though, is not a policeman, and has no greater arrest rights than an ordinary citizen. (Tr. 82); see generally 25 U.S.C. §§ 1a, 2.

9. "X" had already confessed to the assault. The following is the testimony of George Hill at Tr. 95–96:

Q. And what did the defendant say, as best you recall, or what questions were asked?
A. At the reconvening of the meeting or the interview, [the F.B.I. agent] went over the ground where we had already been in the interview and explained that we were at a point of either confessing to it, or, you know, obtaining a confession or releasing ["X"], and [appellant's father] then advised that they did not wish to say anything until an attorney arrived.
There was a conversation between [the appellant's parents] that I did not overhear, then [the appellant's father] asked me if I felt that they should say something, and I told them that—explained what his right was,

that they did not wish to say anything until an attorney arrived. (Tr. 96). There was then a discussion between the appellant's parents, and they asked Hill if they should say something to the police. Hill again explained that they did not have to say anything. The parents again conferred, and agreed that "X" should tell what he knew. At this point one of the F.B.I. agents asked "X" if he had killed Miss Brown, and he said that he had. (Tr. 96).

The question of the motive for the murder remained. Believing that the motive was sex, and that "X" would be reluctant to discuss the topic in the presence of his parents, the law enforcement officers agreed that only Hill and Chief Smith would remain in the room to question "X." As his parents left, they told "X" that they wanted him to go ahead and talk. (Tr. 103). That he did, confirming the suspicion that sex was the motive. The statements made by "X" were then reduced to writing and signed.

Chief of Tribal Police Smith took "X" to a county juvenile home at approximately 4:15 p. m. that afternoon. (Tr. 69). The boy was finally brought before a magistrate the following Monday afternoon, May 17.[10] There was no further questioning by law enforcement authorities.

At trial, the F.B.I. agents and Smith related the details of the boy's statements. Although Hill testified at the preliminary hearing on the motion to suppress the murder confession, neither he nor "X" testified at the trial as to the statements.

### I. The Admissibility of the Murder Confession

The appellant contends that his murder confession should have been suppressed be-cause it was illegally obtained. He contends that 18 U.S.C. § 5033 required police officials to immediately produce him before a magistrate after arrest. The statute reads:

> Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensive to a juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense.

> The juvenile shall be taken before a magistrate forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate.

There is no case law as yet reported on this statute, although there are a few reported cases on its predecessor statute, 18 U.S.C. § 5035. The predecessor statute reads, as relevant:

> Whenever a juvenile is arrested for an alleged violation of any law of the United States, the arresting officer shall immediately notify the Attorney General.

> If the juvenile is not forthwith taken before a committing magistrate, he may be detained in such juvenile home . . . to insure his safety or that of others.

> In no case shall such detention be for a longer period than is necessary to produce the juvenile before a committing magistrate.

that he did not have to answer the questions if they felt that he shouldn't, and they [the appellant's parents] again conferred and agreed that ["X"] should tell what he knew and get it over with. At this point [the F.B.I. agent] asked if he had killed [Miss Brown] and he said that he had.

10. It was not until this day that the United States Attorney could file a certificate required under 18 U.S.C. § 5032, indicating that the local county prosecutor refused to assume jurisdiction over the appellant. Section 5032 provides

that a juvenile "shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to an appropriate district court of the United States that the juvenile court or other appropriate court of a state . . . refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency." This certificate was filed along with the information charging the two counts of juvenile delinquency.

Comparison of the language of the two statutes reveals that while the first sentence of the second paragraph of the statute as amended in 1974 appears to repeat the old standard of arraignment "forthwith," the next sentence now appears to say the "forthwith" requirement bars only "unreasonable," not "unnecessary," delays.

The appellant contends that, properly read, 18 U.S.C. § 5033 precludes detention for the purpose of interrogation, regardless of how benign the questioning may be. He adds that the statute requires an arrested juvenile to be brought before the nearest magistrate with no more delay than necessary for transportation. Such prompt action to protect the rights of a juvenile imposes a burden on law enforcement authorities and upon the magistrate greater than that imposed where the defendant is an adult, according to the appellant's reading of the statute and case law.

Although nothing in the legislative history of the 1974 Juvenile Delinquency Act addresses the purpose of section 5033,[11] appellant argues that by examining the Act as a whole, one can see an apparent Congressional intent to increase post-arrest protection of juveniles. The Senate report on the 1974 amendment says only that the bill was intended to provide "basic procedural rights" for juveniles and "to bring Federal procedures up to the standards set by the various model acts, many state codes and court decisions." S.Rep.No.93–1011, 93rd Cong., 2nd Sess., *reprinted in* [1974] U.S. Code Cong. & Admin.News, p. 5284. Its commentary on the specific section merely noted that the section was implementing the due process protections such as advisement of right to counsel and right to remain silent provided for in *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and progeny, as well as incorporating "the rehabilitative concept of a juvenile proceeding as promulgated in model juvenile court acts." *Id.* at 5312.

The appellant argues that these benevolent intentions, which were coupled with other procedural innovations such as the sealing of records (§ 5038), are good evidence that Congress could not possibly have intended to prune the rights of juveniles.

This court has never interpreted § 5033 or its predecessor, § 5035. Appellant, however, brings to our attention decisions from other circuits. In *United States v. Glover*, 372 F.2d 43 (2d Cir. 1967), a juvenile was detained for about fifteen hours and then questioned before being arraigned. The court suppressed the damaging statement made during that questioning, finding in the "necessity" requirement of § 5035 "no hint of any purpose to allow detention for any other objective than prompt arraignment before a judicial officer, so that the magistrate may explain and protect the juvenile's rights—among others, the right against compulsory self-incrimination and the right to the assistance of counsel." *United States v. Glover*, 372 F.2d at 46. The court interpreted the statute as evincing Congressional concern for "the greater need of the young and inexperienced for independent, unbiased advice as to the right to counsel and the right to refrain from self-incrimination when interrogated by the police authorities." *Id.* at 47.

*Glover* was followed by *United States v. Binet*, 442 F.2d 296 (2d Cir. 1971). In *Binet*, there was only a four-hour delay before the incriminating statements were extracted. The court was careful to point out that under the circumstances of that case, there was no possible investigatory motive for the questioning, and that the delay and prearraignment questioning were solely for the purpose of obtaining a confession. *United States v. Binet*, 442 F.2d at 299–300. In the instant case law enforcement authorities were investigating two crimes committed practically contemporaneously, with the initial assault confession being of doubtful truth.

---

11. The [1974] U.S.Code Cong. & Admin.News, p. 5320 contains an explanation of section 5033 but it offers no real insight.

The Eighth Circuit Court of Appeals followed *Glover* and *Binet* in *United States v. DeMarce,* 513 F.2d 755 (8th Cir. 1975). A juvenile was arrested during the early morning hours of July 6, 1974, a Saturday. Bureau of Indian Affairs police lodged the juvenile at a detention center. He did not appear before a magistrate until Tuesday, July 9, after an eighty-hour pre-arraignment delay. At some unspecified time during that period of delay, admissions were made to law enforcement authorities. The district court ordered the statements suppressed and the Court of Appeals affirmed, although the delay was apparently unintentional.

Appellant argues that in light of the predecessor statute having been construed in this manner by the cases aforementioned, it remains to be seen whether Congress in the 1974 Act intended to alter the state of the law or reduce the protection it afforded juveniles.

■ We are not persuaded by the appellant's argument. This judgment is made in light of the strong policy this court has in following the rule that the waiver of legal rights following *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings also constitutes a waiver of those rights enunciated in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). This rule was pronounced in *Pettyjohn v. United States,* 136 U.S.App.D.C. 69, 419 F.2d 651 (1969), *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970), expressly adopted by this court in *United States v. Lopez,* 450 F.2d 169 (9th Cir. 1971), and has been followed consistently in the past. *United States v. Mandley,* 502 F.2d 1103 (9th Cir. 1974), *United States v. Woods,* 468 F.2d 1024 (9th Cir. 1972), *cert. denied,* 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 496 (1972); *United States v. Cluchette,* 465 F.2d 749 (9th Cir. 1972).

■ The above cases deal with the waiver of rights under F.R.Cr.P. 5(a),[12] of which 18 U.S.C. § 5033 is the direct counterpart. While we are mindful of the rights of juveniles at the adjudicative stage of a proceeding to those essentials of due process and fair treatment afforded adults,[13] we are not aware of any law to the effect that juveniles are entitled to any *greater* rights than adults,[14] nor do we so interpret 18 U.S.C.A. § 5033.

■ We are of the opinion that there was a valid *Miranda* waiver by the boy and his father at the F.B.I. office. It is undisputed that at the time of the rendition of *Miranda* rights and the waivers, the boy's parents were present.[15] The evidence is conclusive that they understood their rights. The examining officers were, we feel, scrupulously fair and deliberate in ascertaining that both

12. F.R.Cr.P. 5(a) has been interpreted as forbidding any "unnecessary" delay in arraignment of adult defendants. *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

13. *See In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *In Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

14. The Supreme Court at page 13 of *In Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), stated that "we are not concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process." At note 48 of the opinion, the Supreme Court added that "problems of pre-adjudicative treatment of juveniles and of post-adjudicative disposition, are unique to the juvenile process; hence what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage has no necessary application." *In Re Gault,* 387 U.S. at 31, 87 S.Ct. at 1445.

15. Appellant contends that the presence of the parents was no substitute for the presence and aid of an attorney. Citing the "disparate interests" of the juvenile and his parents, the appellant argues that the presence of the parents worked against the juvenile's interest, in that the parents "prodded" a confession from him. Brief for Appellant at 19–20. We do not feel the record reflects "prodding," nor are we prepared to engage in the speculation which would be necessary to fathom any disparity in interests between "X" and his parents, absent any evidence of such in the record.

"X" and his parents understood his rights under *Miranda.*

■ To be valid the waiver must have been voluntary. In *DeSouza v. Barber,* 263 F.2d 470 (9th Cir. 1959), this court was confronted with an appellant who contended that as an infant he could not effectively admit or waive his right to counsel. We emphasized in that case:

> Whether the confession or admission is competent depends not alone upon the infant's age, but also upon his intelligence, education, information, understanding and ability to comprehend. (citations omitted).

The same factors should be considered in determining whether an infant is competent to waive counsel. In *Williams v. Huff,* 79 U.S.App.D.C. 31, 142 F.2d 91, 94 (1944), the Court of Appeals for the District of Columbia had under consideration habeas corpus proceedings where a seventeen year old boy had waived his right to counsel in a criminal case. While the author of the opinion would have held as a matter of law that a boy of seventeen cannot competently waive his right to counsel in a criminal case, the majority of the court took the position that the 'appellant's competence was a question of fact, in the determination of which his youth was entitled to serious consideration but was not necessarily conclusive', and that the 'District Court should take evidence and determine whether, in the light of his age, education, and information, and all other pertinent facts, he has sustained the burden of proving that his waiver was not competent and intelligent'. *See* also *Curtis v. Hiatt,* 161 F.2d 621 (3d Cir. 1947); *Shioutakon v. District of Columbia,* 98 U.S.App.D.C. 371, 236 F.2d 666 (1956); *McBride v. Jacobs,* 101

U.S.App.D.C. 189, 247 F.2d 595 (1957), *cf. Dooling v. Overholser,* 100 U.S.App.D.C. 247, 243 F.2d 825 (1957). *DeSouza v. Barber,* 263 F.2d at 476–477.[16]

In *McBride v. Jacob,* 101 U.S.App.D.C. 189, 190, 247 F.2d 595, 596 (1957), the court propounded:

> [O]bviously not all minors are capable of making a waiver. Where the court finds for any reason the minor is not capable of waiver the parent may so waive provided the court also finds there is no conflict of interest between them, and of course the waiver by the parent must be an intelligent, knowing act.

We find no evidence in the record to persuade us that either "X" or his parents lacked capacity to make a knowing waiver of *Miranda* rights, nor was there evidence of a conflict of interest. We feel that the decision to make a statement to the F.B.I. was an intelligent, knowing one. Since the *Miranda* waiver was valid, there was a valid waiver of the *McNabb-Mallory* prompt arraignment right. We find the district court committed no error in admitting the appellant's murder confession into evidence.

■ Even assuming *arguendo* that error in this area was committed, we are of the opinion it was harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We find that under the appropriate standard of certainty for nonconstitutional error in this Circuit that any error was more probably than not harmless. *United States v. Valle-Valdez,* 554 F.2d 911 (9th Cir. 1977). Though one could strain to find language in *Glover, supra,* perhaps the leading case to the effect that a juvenile speedy arraignment requirement is mandated by *Miranda,*[17] it is fairly clear that its holding was based solely on the statute.[18]

---

**16.** The same factors should be considered in determining whether an infant's confession or admission is competent. *DeSouza v. Barber,* 263 F.2d at 477.

**17.** *United States v. Glover,* 372 F.2d 43, 47.

**18.** We are cognizant of the drift of appellant's argument that his murder confession was

coerced. We are also mindful that the Supreme Court has held certain kinds of constitutional error require automatic reversal, among them the use at trial of a coerced confession. *Payne v. Arkansas,* 356 U.S. 760, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). However, we believe that the confession in this case was free of that type of coercion present in *Escobedo v. Illinois,*

We feel that evidence of appellant's guilt, aside from his murder confession, was overwhelming. Blood of appellant's type was found on Miss Brown's blouse and shawl. One of Miss Brown's hairs, crushed as with a blunt instrument, was found on appellant's jacket. The woman was slain by a right-handed person, as is appellant. He was the last person seen with the two victims. Finally, while he was at the juvenile detention facility, he was visited by one of his teachers. She testified that she asked the boy if he committed the crimes of which he was accused. He replied, "Yeah, I guess so. Yeah, I did it." (Tr. 678).

## II. *Destruction of F.B.I. Notes*

At the interview of May 14 in the F.B.I. office, one of the F.B.I. agents took three to four pages of rough notes which he later used to compile his official report of the boy's confessions. Appellant arrived at the F.B.I. office about 1:30 p. m. (Tr. 47), and was detained and questioned there until 4:00 p. m. (Tr. 76), including the time required to prepare the statement he signed. Before trial, the appellant moved to exclude the testimony of the F.B.I. agent as to the confessions on the grounds that the destruction of the notes violated the Jencks Act, 18 U.S.C. § 3500, F.R.Cr.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial judge denied this motion, and the appellant now raises this issue on appeal.

*United States v. Robinson,* 546 F.2d 309 (9th Cir. 1976), was decided after the trial of the present case and is instructive. There we reasoned:

378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), where the defendant was harassed and intensely interrogated. Nor was the appellant in the situation of the juvenile defendant in *Gallegos v. Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). There the defendant, a fourteen-year old boy, was held by the police for five days while cut off from his parents "without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself." *Gallegos v. Colorado,* 370 U.S. at 54, 82 S.Ct. at 1213. Said the Court:

Appellants . . . argue that the destruction of the F.B.I. notes violated their rights as established by the Jencks Act, 18 U.S.C. § 3500; *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and Rule 16 of the Federal Rules of Criminal Procedure. In *United States v. Harris,* 543 F.2d 1247 (9th Cir. 1976), this court held that even the good faith destruction of rough notes in accordance with normal F.B.I. procedure is unjustifiable. The Court stated:

Notes taken by F.B.I. agents in interviews with prospective government witnesses or, as in this case, with the accused, constitute potentially discoverable materials. Since the routine disposal of potentially producible materials by the F.B.I. amounts to a usurpation of the judicial function of determining what evidence must be produced in a criminal case, we hold that such original or rough interview notes must be preserved. (Citations omitted).

*Accord, United States v. Harrison,* 173 U.S.App.D.C. 260, 524 F.2d 421 (1975). The holding in *Harris* is controlling here. However, the Court in *Harris* found that the destruction of the rough interview notes was harmless error. It made clear that the requirement of retaining the rough notes was prospective only. The F.B.I. should not be sanctioned for failing to follow a rule not yet in force. *United States v. Robinson,* 546 F.2d at 312.

■ The appellant argues that although *Robinson* is controlling, the agent's testimony should have been excluded because the loss of the notes was prejudicial to him. We feel that the *Harris* court relied on

A lawyer or an adult relative could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year old boy would not be able to know, let alone assert, such constitutional rights as he had. *Id.* at 54, 82 S.Ct. at 1213. This protection the appellant had. We do not feel the confession was coerced.

nonconstitutional grounds in making its decision, and, therefore, we find that the proper standard to be applied is whether it is more probable than not that the error was harmless. *United States v. Valle-Valdez, supra.*

However, even if the error is viewed as a constitutional one,[19] i. e., violation of the confrontation clause, *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the error can be viewed as a harmless one, since the evidence apart from the testimony of the F.B.I. agent concerning the appellant's murder confession was overwhelming. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Such evidence has been summarized previously in this opinion.

### III. *Evidence of Racial Identification*

A necessary element of federal jurisdiction in this case is that the acts were committed by an "Indian person against the person . . . of another Indian," 18 U.S.C. § 1153. Appellant contends that the government failed to meet its burden of proof as to this element.

The principal piece of evidence as to racial identification was a tribal roll, last updated in August of 1974. On this list were names identical to those of the appellant and the two victims. In addition, there was a large measure of circumstantial evidence. Jones testified that he lived on the reservation. (Tr. 447). Appellant's mother testified that she was a cousin of Miss Brown and that her children were very close to Miss Brown. (Tr. 667). Miss Brown's hospital record was admitted which indicated that she was an Indian. (Tr. 194). A friend of the appellant testified that he lived next to the home of the parents of "X" on the reservation. (Tr. 390–391). An-

other enrolled tribal member testified that the appellant's family home was located on the reservation about two blocks from where the assault and murder took place. (Tr. 197).

Although it has been held that enrollment or lack of enrollment is not determinative of one's status as an Indian, *United States v. Ives,* 504 F.2d 935, 953 (9th Cir. 1974), *vacated on other grounds,* 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), we feel that, while the evidence here is not overwhelming, it would appear to go beyond mere enrollment and suffice for purposes of the statute, at least where there is absolutely no evidence to the contrary. *See also Azure v. United States,* 248 F.2d 335 (8th Cir. 1957); *cf. United States v. Heath,* 509 F.2d 16 (9th Cir. 1974), where this court held tribal enrollment sufficient to allege jurisdiction for purposes of 18 U.S.C. § 1152.

### IV. *Equal Protection*

The appellant claims that because of the curious structure of the criminal laws regarding Indians, he faced a more severe punishment for his assault conviction than would have a non-Indian who had committed the same offense. This state of affairs, appellant contends, deprives him of his right of equal protection as guaranteed by the due process clause of the Fifth Amendment.

Under the juvenile sentencing provisions, appellant's sentences for the assault and the murder must run concurrently. As the appellant must remain in the custody of the Attorney General until his twenty-first birthday, he received, in effect, a seven year sentence for the second degree murder conviction.[20] The appellant received five years for the assault element of his conviction for juvenile delinquency. We choose,

---

19. For an enlightening treatment of the dichotomy between constitutional and nonconstitutional error in the application of harmless error standards, *see United States v. Valle-Valdez,* 554 F.2d 911, 915–916 (9th Cir. 1977).

20. At the time of conviction of having committed an act of juvenile delinquency, the appellant was in the fifteenth year of his life. He was 13 at the time he committed the offenses and 14 at the time of trial. His sentence was determined under the authority of 18 U.S.C.A. § 5037(b).

therefore, to exercise our discretion not to decide this issue. *Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *United States v. Buck,* 548 F.2d 871 (9th Cir. 1977).

## V. *Requirement of Indictment*

The appellant contends that 18 U.S.C. § 5032 violates the Fifth Amendment by instructing the United States Attorney to proceed by information rather than indictment. He interprets the decision in *United States v. Ramirez,* 556 F.2d 909 (9th Cir. 1976), as raising the question of whether an indictment is necessary under the facts of this case. On rehearing, this court withdrew its opinion in *Ramirez. United States v. Ramirez,* 556 F.2d at 926.

The Supreme Court noted in *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), that the rehabilitative purpose of juvenile delinquency proceedings obviates the requirement of the formalities of the criminal adjudicative system.[21] The Court held that the constitutional right to a trial by jury is not required in the adjudicative phase of state juvenile court delinquency proceedings. This court followed that reasoning in *United States v. Salcido-Medina,* 483 F.2d 162 (9th Cir. 1973), in which we cited *McKeiver* as authority for the holding that a juvenile delinquency proceeding under 18 U.S.C. § 5033, as it then read, was not intended to be a criminal trial and no jury was required. *United States v. Salcido-Medina,* 483 F.2d at 164. Three years later, this court held that 18 U.S.C. §§ 5032 and 5033, as amended, do not grant a juvenile being processed thereunder a statutory right to a jury trial. *United States v. Martin-Plascencia,* 532 F.2d 1316, 1318 (9th Cir. 1976).

 Appellant would have this court eliminate the differences between criminal and juvenile proceedings, a tack the Supreme Court refused to take in *McKeiver,* and which this court has declined to pursue in *Salcido-Medina* and *Martin-Plascencia.*

In light of the law developed on the issue of the right to a trial by jury in juvenile proceedings, we feel it is logical to apply the same reasoning to the issue of whether indictment is required in such a proceeding. We feel that it is not required, and find persuasive the reasoning of *United States v. Hill,* 538 F.2d 1072, 1076 (4th Cir. 1976). The Fourth Circuit Court of Appeals propounded:

> The statute, § 5032, provides that the proceeding "shall proceed by information." Also, § 5031 provides that juvenile delinquency is a violation of law "which would have been a crime if committed by an adult." Since the Fifth Amendment provision requiring grand jury indictment on its face applies only to "a capital, or otherwise infamous crime", and since *McKeiver,* among other cases, has held that juvenile delinquency is not a crime, the Constitution on its face has no application to the claim of the defendant. *See Kent v. United States,* 383 U.S. 541, 555, 86 S.Ct. 1045, 16 L.Ed.2d 84; *In Re Gault,* 387 U.S. 1, 15, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). While it is true *Kent* and *Gault* did not hold that a grand jury was not required in juvenile proceedings, those cases did recite that its absence or the absence of like formalities were within the intent of the various juvenile statutes. Since the defendant has not been charged with a crime, and since the intervention of a grand jury plays no part in the essential fairness of the proceeding so far as "accurate fact finding is concerned," *McKeiver,* 403 U.S. at 543, 91 S.Ct. 1976 we are of opinion the statutory provision providing for proceeding by information rather than indictment is free from constitutional infirmity as to the claim of conflict with the Fifth Amendment.

This court likewise finds that it was proper for the United States Attorney to proceed by information under 18 U.S.C. § 5032 rather than by indictment.

*AFFIRMED.*

---

**21.** The appellant concedes that one possible reason the indictment might not be applicable to juvenile proceedings is that, on balance, a requirement of indictment would undercut the objective of juvenile adjudications. Brief of Appellant at 35.